GOULD, UNITED STATES ex rel. (BROWN v.). See Case No. 1,862.

## Case No. 5,636.

### GOULD v. CHRISTIANSON.

[Blatchf. & H. 507.][1]

District Court, S. D. New York. Feb., 1836.

MINOR SEAMEN—CORPORAL PUNISHMENT — DISCIPLINE—DUTY OF MASTER.

1. A minor, who is placed by his father in a ship for an experimental voyage, to improve his health, and to learn navigation and the duties of a seaman, and who signs the shipping articles as a boy, is subject to the rules and discipline of the ship.

2. The master, in the exercise of a reasonable discretion, may rightfully inflict corporal punishment on such minor. No distinction, in this respect, exists in law, between common sailors and young men of education and refinement and of gentle bringing up.

3. It is a matter of public policy to encourage youths of cultivated minds and respectability of character and position to enter the merchant marine as seamen.

4. Discipline on shipboard should, in all cases, be carried out, if it is practicable, by suasion and reasoning addressed to the men; and masters can employ force only when it is manifestly necessary. This principle is most strictly obligatory in respect to boys who are known to the master to labor under physical infirmity, or to have been delicately brought up, or to possess talents and

[1] [Reported by Samuel Blatchford, Esq., and Francis Howland, Esq.]

acquirements and to have entered the service to qualify themselves for the profession.

5. The master is not in loco parentis, in respect to a minor, so as to be exempt from responsibility in an action by such minor for a wrongful exercise of power in correcting him, to the same extent that a father might be exempt.

6. In such action, damages will be estimated with regard to the character and position of the libellant, and will not be limited exclusively to a remuneration for the bodily injury.

7. Excessive or vindictive damages will not be awarded in such a case, unless the punishment has been wantonly inflicted by the master, with a view to the disgrace and mortification of the libellant, and not for the enforcement of discipline.

This was a libel in personam [against Charles H. Christianson] to recover damages for assault and battery.

The pleadings in this case are inserted at large, that the references made to them in the opinion of the court may be the better understood, and that the version of the case given by each party under oath may fully appear. The libel, which was filed on the 20th of November, 1834, was as follows:

"To the Honorable Samuel R. Betts, Judge of the United States for the Southern District of New-York: The libel of John Gould, an infant, under the age of twenty-one years, exhibited by Edward S. Gould, his nearest friend, showeth:

"That your libellant, with a view of learning the art of navigation and the management of ships at sea, engaged himself on board the ship Commerce, of Philadelphia, of which Charles H. Christianson was master, in the month of May, in the year of our Lord one thousand eight hundred and thirty-three, to perform a voyage from the United States to the Pacific Ocean, and the ports of Chili and Peru therein, and thence to Canton, and back to New-York; and your libellant entered on board the said ship as a sailor or boy before the mast, and, at all times during the said voyage, while on board the said ship, performed his duty according to the best of his knowledge, skill and bodily strength. Your libellant further showeth, that he was then of the age of eighteen years, of slender make and strength, and had never before been to sea, and had been wholly unaccustomed to the duties and hardships of a sailor's life, and, having friends and relatives in easy and affluent circumstances, pains were taken to explain the situation of this libellant to the said Charles H. Christianson, who was wholly apprised of your libellant's situation, before the sailing of the said ship. Your libellant further showeth, that at various times prior to this libellant's leaving the said ship at Valparaiso, in South America, hereinafter mentioned, and without any just or reasonable cause, and, as your libellant believes and alleges, with the mere wantonness of cruelty, and to show his power and dominion over what he termed a gentleman's son, the said Charles H. Christianson beat, bruised and ill-

treated, by blows with his fists, with his feet, and with large and unsuitable ropes, the body of your libellant, and degraded and disgraced him as far as was in his power, and accompanied his said ill-treatment with oaths, curses and gross verbal abuse, all of which misconduct on his part was committed on the high seas, and within the jurisdiction of this honorable court, and without the criminal jurisdiction of any other court.

"Your libellant, in specification of his aforesaid general allegation in this behalf, doth further show, allege and declare as follows, that is to say: First.—That on or about the third day of June, of the said year, after they had been at sea about a fortnight, this libellant passed forward along the weather side of the companion-way, doing so in ignorance of and inadvertence to the etiquette of that passage being reserved to the ship's officers and passengers; whereupon, the said Charles H. Christianson seized this libellant with great violence, and pushed him as violently as possible against the lee rail of the ship, inflicting a severe bruise upon the body of this libellant, the effects of which continued for several days, at the same time using, in presence of the supercargo, a passenger, and several of the crew, language to the following effect: 'You damned booby, I'll teach you to come this side.' Second.—That, on the fourth day of June aforesaid, your libellant being put to picking potatoes on the quarter-deck, and leaning against the binnacle-house, the said Charles H. Christianson came up, and, without any order or remonstrance to this libellant, and without any knowledge or suspicion on your libellant's part that he was in any fault, kicked your libellant under his right arm with violence, in the presence of the other boy on board, at the same time using language to the substance and effect following, namely: 'You damned lazy rascal, lie down to your work.' Third.—That, on or about the second day of said June, when the ship was in the operation of tacking, at about five o'clock in the afternoon, this libellant, not knowing which rope was the main sheet, and being guilty of no fault in this respect, the said Christianson violently collared your libellant with one hand, and struck him violently with his other fist in the back, and shoved your libellant towards the rope, using the language: 'There, damned rascal, see it now.' Fourth.—That, on or about the twentieth day of June aforesaid, this libellant, being ordered to find the mizzen-royal brace, and being unable, from his inexperience, to do so, the said Christianson showed it to this libellant, and asked him if he would know it, whereupon this libellant answering, 'Yes, sir,' the said Christianson struck this libellant with the said rope, with his full strength, adding: 'Shall you remember it now, you damned rascal?' Fifth.—That, on the same day last mentioned, this libellant being forward, and lifting the fore-topmast studding-sail, and declaring his inability to lift it, the said Christianson used to your libellant the language: 'Yes, you can, you damned rascal, you don't lift a pound;' and, as your libellant was stooping to try to lift it again, the said Christianson knocked your libellant down upon the deck by a stroke with the end of the main-tack, a very hard rope, about two inches in diameter, upon the small of the back, and stood over your libellant, ready to renew the blow; that he then laid down the rope, and turned away; that the effect of this blow was a chronic inflammation of the membrane enclosing the spine, and an injury from which your libellant has not yet recovered. Sixth.—That, on or about the twenty-fourth day of June, being on the quarter-deck, in presence of several passengers, the said Christianson asked your libellant where a rope led which he had hold of; that your libellant, being near-sighted, could not immediately tell, upon which said Christianson knocked off this libellant's hat, caught him by the hair, pulled his head back, and rubbed his ears violently and said: 'Now, you damned blind man, do you see?' and your libellant declares that he was inexperienced, and did not know all the ropes in the ship, and the said Christianson was well aware of the fact. Seventh.—That, on or about the twenty-fourth day of July, the wind blowing a gale, and the ship rolling heavily, your libellant was walking aft, holding on to steady him, whereupon the said Christianson struck your libellant and kicked him down to leeward, and, as your libellant stopped half way, he followed him, and kicked him the remainder of the distance across the deck, adding: 'You damned wooden man, take that.' Eighth.—That, on the twenty-sixth day of July, your libellant having a leather belt around him, fastening his coat around him, the said Christianson, without other cause or provocation than merely this deponent's having on said belt, (never having been forbidden to wear it,) took off the said belt, flogged your libellant with it, and threw it overboard, and in the evening pulled your libellant's nose and ears, and slapped his face. Ninth.—That, on or about the fourth day of August, your libellant was sick, and was ordered by said Christianson to feed the pigs on board. Your libellant told the man bringing the order, of his inability, upon which the said Christianson renewed the order, and threatened to flog your libellant. Your libellant then went on deck on his hands and knees, and crawled about to execute said order, being unable to do otherwise, whereupon the said Christianson kicked your libellant along, saying that he was a damned lazy skulking rascal. Tenth.—That, on or about the nineteenth day of August, this libellant standing awkwardly at the pump in pumping the ship, the said Christianson kicked and struck this libellant until the said Christianson was tired and ceased for that reason.

"And your libellant further shows that, in a vast number of other instances, for the most trifling causes and on the most insufficient provocation, the said Christianson was in the habit of striking, beating and swearing at your libellant, and treating him in all respects in the most degraded and brutal manner, in presence of crew and passengers, he, the said Christianson, knowing that, from the libellant's previous mode of life, such conduct was more deeply wounding to the feelings of this libellant, as a man able to feel disgrace, than the mere bodily suffering, however severe. Your libellant humbly submits that the said Christianson, both by way of redress and reparation to your libellant, and by way of example to others and of monition to himself, ought to be compelled to make ample satisfaction to your libellant for the said grievances, and that five thousand dollars is claimed by your libellant as such satisfaction. Your libellant further showeth, that the said Christianson is now within this district, and your libellant apprehends that he will depart therefrom without delay. To the end, therefore, that the said Charles H. Christianson may be compelled to answer in this honorable court in the premises, and may be decreed to satisfy your libellant in the premises for all the said grievances, and that he may be held to bail in such sum as your honor shall think meet, may it please your honor to award the process of this honorable court to the marshal, commanding him to take the said Charles H. Christianson, and hold his body until he shall have answered the premises, and have performed and made such satisfaction in damages to your libellant as your honor shall judge suitable and decree in this behalf. And your libellant will ever pray.

"Sworn this 20th day of November, A. D., 1834.                      John Gould.
"Fred. J. Betts, Clerk.
                    "Daniel Lord, Jr., Proctor."

On the filing of the libel, bailable process in the sum of $500 was issued. The answer, which was filed on the 3d of December, 1834, was as follows:

"To the Honorable Samuel R. Betts, District Judge of the United States for the Southern District of New-York: The answer of Christian H. Christianson, who is proceeded against by the name of Charles H. Christianson, master of the ship Commerce, to the libel of John Gould, who sues by his next friend, Edward S. Gould:

"This respondent, saving and reserving all manner of benefit of exception to the many errors, insufficiencies and untruths in the said libel contained, for answer thereto, or so much thereof as is necessary to be answered, says, that it is true that this respondent was master of the ship Commerce, of Philadelphia, for the voyage from the port of New-York to Canton, and back, in the libel mentioned, and that the libellant shipped on board the said vessel for said voyage out and home, as boy, but not as seaman. And this respondent supposes, and

therefore admits, that the said libellant may have had a view of learning the art of navigation and the management of ships at sea, in engaging in the said voyage. And this respondent admits that the libellant was at the time aforesaid, of about the age of eighteen years, and was of a rather slender frame, though not remarkably so for that age, and that his friends were in easy and affluent circumstances, and that the libellant was unaccustomed to the duties and hardships of a sailor's life. But this respondent denies that he was ignorant of the hardships he would be compelled to undergo in this occupation. On the contrary, this respondent saith, that he was applied to by Mr. Pelatiah Perit, of the house of Goodhue & Co., of the city of New-York, the consignees of the said ship, in behalf of the said libellant, for a situation for the said libellant as ship's boy for the said voyage. That respondent was averse to taking the libellant, from his experience of the trouble and difficulty often arising from taking persons under similar circumstances, and stated such objections to the said consignee, and that the respondent did not consent to take the libellant until he had an interview with the father of the libellant, when respondent repeated to his said father his objections to taking the libellant, and stated to him distinctly the nature of the duties that would be required of him, and the hardships that must be encountered, to all which his father replied, that the libellant was aware of it, but had set his mind upon going to sea, and urged deponent to receive him accordingly, and defendant at length consented, as a favor, to receive him in that capacity.

"And this respondent further saith, that he endeavored to teach the libellant the duties of practical seamanship, by himself and officers, by showing him the different ropes and parts of the vessel, and explaining their names and use, and by putting him to such work as was suitable to his strength and capacity, and, in so doing, used no undue or unreasonable hardship or severity, and not more than the necessity of the case required, nor than is customary in training boys for the rough and hardy life of a seaman. And this respondent denies that he was guilty of cruelty towards the libellant, through wantonness, or to show his dominion and power over a gentleman's son, or through any other cause, or that he at any time bruised or ill-treated him either with his fists, feet, or with large or unsuitable ropes. On the contrary thereof, this respondent saith, that the libellant was treated with kindness and indulgence; that he was not required to sleep in the forecastle with the common sailors, but occupied the steerage with the carpenter and one John Childs, a gentleman's son, who came on board under like circumstances; and further, that a part of the time the libellant was excused from his regular duty on deck, and only assisted in the cabin; and that, at all other times, he was only required to attend to the

ordinary boys' business on board ship. And respondent further saith, that the libellant was exceedingly awkward and useless about ship, and that he either took no pains or was unusually dull in learning his duty on board, and was accustomed to set about his work muffled up in great-coats and jackets, entirely unfit for his station and occupation, and for all of which this respondent at times reprimanded the libellant, but without abuse, curses or other ill language, and respondent may at times have gently laid his hands upon libellant, and quickened his movements, or directed his attention when he was peculiarly backward or dull in executing orders, but without any more violence than was requisite for such purpose, and without any intention of injuring or ill-treating the libellant; but defendant has no recollection of other instances than such as are hereinafter set forth And this respondent further answering denies, that he was guilty, at the several times in the libel particularly mentioned, of the assaults and outrages therein set forth, or any of them. And this defendant denies, that on or about the third day of June, in the libel mentioned, he seized the defendant, and pushed him with violence against the lee rail of the said ship, or inflicted any serious bruise on the body of the libellant, but defendant admits that, after he had informed the libellant of the usage of ships in regard to the use of the weather side, and had cautioned him against trespassing against the said usage, upon libellant's disobeying such direction, this respondent may have taken hold of the libellant and removed him to the proper side of the vessel, using no more force than was proper and necessary for that purpose. And this respondent denies that on the fourth of said month of June this defendant kicked the said libellant. And this defendant denies, that on or about the 2d day of June aforesaid, this respondent collared and struck violently the said libellant: but this respondent says, that about that time, to the best of respondent's recollection, on the occasion of tacking ship, the libellant being ordered to take hold of the main-sheet, and being very slow or backward in obeying the orders, respondent slightly pushed the libellant towards the same to quicken his steps, but without abuse or undue violence. And this respondent further answering denies, that on or about the twentieth day of June, this respondent struck the libellant with his full strength with the mizzen-royal brace; but this respondent saith, that at or about that time, as nearly as respondent recollects, the libellant, having been repeatedly shown the said rope, and being, in the course of the duty of the ship, ordered to take hold of the same, did not obey the order; that defendant thereupon showed him the rope again, and slightly hit the libellant with the bight of it over his jacket or great-coat, for the purpose of quickening his attention and making him more observant of his duty, but the same was without violence, and could have inflicted no injury on the libellant. And respondent saith, that the said royal mizzen-brace is one of the smallest and loosest ropes on board the ship, of about half an inch diameter. And the respondent further answering denies, that on the same day last mentioned, or at any other time, this respondent struck or knocked down the libellant with the main-tack or with any other large rope; and the respondent says that the main-tack is a very large, hard rope, and deponent believes that such a blow as in the libel stated would have killed or disabled the libellant. That this respondent is very certain that he never struck a common sailor in such a manner, and that he certainly could not have so struck a lad like the libellant. And this defendant further answering denies, that on or about the twenty-fourth of said June, respondent knocked off libellant's hat, pulled his hair or rubbed his ears with violence, but respondent saith, that at or about that time, as well as respondent can recollect, libellant, through neglect and inattention, not being able to find a rope which he was ordered to do, this respondent may have slightly taken hold of libellant and turned his head in the direction of the rope, for the purpose of directing his attention thereto and making him more attentive to his duty, but without violence or the abusive treatment in the libel stated. And this defendant further answering denies, that on the 24th day of July, this respondent kicked the libellant, or that he kicked him at any time.

"And this defendant further answering says that the said libellant was ordered and instructed to dress himself in proper seaman's apparel, but that, in neglect and disobedience of such orders, he persisted in going about muffled up in great-coats, jackets and handkerchiefs, altogether unfit for his station and occupation, and that some time, on or about the twenty-sixth day of July, as well as respondent recollects as to the time, the libellant being about his work in a superfluous quantity of coats and jackets, secured round his body by a leathern belt, which incapacitated him for prompt and seamanlike attention to his business, this respondent took off and threw away the said belt, and directed the libellant to adopt a different sort of dress while about his work; and this respondent thinks that he hit the libellant over his great-coat with the said belt, which was a very light and trifling one, for the purpose of enforcing his orders aforesaid, but without inflicting any injury on his person; and this respondent denies that he pulled the libellant's nose and slapped his face; and this defendant denies, that on or about the fourth of August, this respondent kicked the libellant, or used the abusive language in the libel mentioned; that defendant did not, on that occasion, require the libellant to perform any work beyond his health and strength; that he did not then, nor does he now, suppose or believe that the said libellant was unwell or unable to attend to the lighter

duties about the ship; and defendant saith, that he was required to feed the pigs as a necessary piece of work usually attended to by the boys on board, and not as an ignominious or disgraceful thing for the libellant to do; and defendant denies, that on or about the nineteenth of August, this respondent kicked or struck the libellant till respondent was tired, or that then, or at any other time, to the best recollection of respondent, he kicked or struck the libellant at or near the pump; and this respondent denies that he made use of the profane and abusive language in the libel stated. On the contrary, this respondent saith, that the use of such language was contrary to the public standing orders of the ship, and contrary to the habits and usage of respondent. And respondent submits, that, in the instances of slight correction aforesaid, this respondent, as such master, was justified and required so to correct the libellant, as well for his own improvement as to insure the prompt and seamanlike attention to the duties and necessary etiquette of the ship. And this respondent further answering denies, that he was in the habit of striking, beating or swearing at the libellant for trifling causes, or otherwise; or that, to the best of deponent's recollection, he ever struck him at any other times than above stated, or that he ever treated him in a brutal or degrading manner, or sought in any way to disgrace him or to wound his feelings. On the contrary, this respondent says, that the libellant was treated with more kindness and indulgence than ship-boys usually are. That, on putting to sea on the said voyage, respondent called all hands aft, and gave them instructions and orders for the voyage, by which he forbid all swearing or fighting on board the said vessel, and forbid the officers of the vessel striking any of the men, except by respondent's orders, and their striking the boys under any circumstances, for the purpose of protecting the boys from the usage which it is common for them to receive, and that he never suffered the officers or crew to strike them at all. And defendant further saith, that he suffered the libellant to abandon the voyage and go on shore at Valparaiso, without any suspicion that the libellant had any ill-will or subject of complaint against this respondent. That, before reaching Valparaiso, libellant repeatedly stated to respondent that he was sick of the sea, and desirous to abandon the voyage, stating, among other things, that his health was improved, but he did not like the life. That respondent, finding the libellant was of no use on board, and, as respondent believed, would never make a sailor, freely consented to his going on shore and giving up the voyage, and referred him to the United States consul for such certificate as would justify respondent in discharging him in a foreign port, which certificate was granted by the consul, and the respondent thereupon discharged the li-

bellant. That, after the libellant had left the ship, respondent repeatedly saw libellant, and had no intimation from him of any complaint against respondent. On the contrary, libellant voluntarily informed the respondent of the embezzlement of the ship's stores by the carpenter, which, he stated, he had been afraid to mention while on board, for fear of the carpenter. And defendant further saith, that as he is informed and believes, and therefore alleges, the said libellant, on his return to the port of New-York, had an interview with Mr. Perit aforesaid, by whom the situation for libellant was obtained, and the libellant then stated that he had seen enough of the sea; and, on being asked by Mr. Perit how he was pleased with the captain, meaning this respondent, the libellant answered that he had no complaint to make against him, or words to that effect.

"Wherefore this respondent prays he may be considered as justified in the premises, and be hence dismissed, with his costs, &c.
                    "C. H. Christianson.
"J. Coit, Proctor for Defendant.
"On this 2d day of December, 1834, before me personally appeared Christian H. Christianson, who, being duly sworn, says, that he has read, or heard read, the foregoing answer, and knows the contents thereof, and that the same is true of his own knowledge, except as to the matters therein stated to be on his information and belief, and, as to those matters, he believes it to be true.
                    "Geo. W. Morton, U. S. Comm'r."

Daniel Lord, Jr., for libellant.
Joshua Coit, for respondent.

BETTS, District Judge. Both parties have gone into very extended proofs in support of their respective pleadings and to repel the allegations brought against them. One commission was executed at Valparaiso and one at Canton; ten other depositions were taken out of court, and six witnesses were examined orally on the hearing. It is not important to analyze, in this opinion, this mass of testimony. Its general bearing throughout is in contradiction of the inflamed charges of the libel, and goes to prove the conduct of the respondent, in the treatment of the libellant, to have been, ordinarily, mild and unobjectionable. This is the tenor of the evidence given by the libellant's own witnesses, who were in the ship with him—not merely the crew, but passengers in reputable walks of life, who may be supposed to appreciate personal rights more justly; whilst the rest of the crew, and all the passengers, including a supercargo and the American consul at Valparaiso, speak in unqualified terms of approval of the general deportment of the respondent in his command, and in regard to the libellant, so far as his situation came under their notice or they heard him speak of it. But, abating the exaggerations in the statement of the libellant's case, and making

broad subtractions from the evidently prejudiced representations of two of his witnesses, the boy Childs and the carpenter, I think there is direct and unimpeached evidence, that on two or three occasions the respondent assaulted the libellant and committed violence upon his person, in a manner not justified by the proofs—first, in pushing the libellant forcibly across the deck, and accompanying the act with a blow or slap on the side of his head, for a breach of etiquette in walking on the weather side of the quarter-deck; again, in cuffing him for awkwardness or lack of activity in setting the pump to work; also, in twitching his head backwards and slapping him for failing to know and find a particular rope he was ordered to haul upon; also, in pulling off the libellant's belt, striking him over the shoulders with it, and throwing it overboard, in presence of the passengers, and taunting and deriding him for his clumsy and ungainly dress and appearance; and again, for striking him across the small of his back with a rope's-end, when he was stooping down in the effort to raise from the deck one end of a yard with a wet sail on it. The court is very careful not to be carried away by the picture given in the libel of this last-named transaction, or by the dubious colorings applied to it by the testimony of the boy Childs, and of another sailor, because their testimony is inconsistent with the after conduct and representations of the libellant himself, and because their credibility as witnesses, if not legally impeached, is much impaired by the testimony of the passengers and of others of the crew. Yet, I cannot deny my belief of the fact that a blow with a rope was given at the time by the respondent. This is the substance of the credible proof in support of the charges in the libel. It may embrace another instance or two of like character; but no punishment or a more aggravated kind appears to have been inflicted on the libellant by the master.

The argument for the defence is, that if the master has not succeeded in wholly discrediting the evidence against him on this subject, he was justified in law for his acts, under the circumstances and in the relation of the parties to each other; and that, in respect to this minor, the master stood emphatically in loco parentis, and was empowered to correct him under the same immunity that a father may correct a child. The rightful authority of a master to correct a mariner at sea, for malconduct or culpable negligence on shipboard, is not now in debate. The libellant's action is put on the footing, that he was entitled to a privilege or exemption in this service, which distinguished his liability to the authority of the master from that of a common sailor; and, if not, that the punishment he received was excessive and cruel. It is in proof that the libellant was about eighteen years of age, and of a delicate constitution, and was desirous of making a long sea voyage to benefit his

health and learn navigation with a view to that profession. He was of highly respectable connections, and had been brought up in a distinguished family and with cultivated and refined tastes. He had never been accustomed to hard labor, and was entirely without experience of the exactions and hardships of seafaring life. From these considerations, his father and friends were opposed to his undertaking the voyage; but, yielding to his persistency, they obtained a berth for him on board the ship Commerce, commanded by the respondent. The libellant's father explained the young man's situation to the respondent, and besought for him treatment on board which might render the service useful and encouraging to him, and contribute to strengthen his constitution and health. The master was reluctant to receive him and another young man, his companion, of about the same age and position in society, alleging that sons of gentlemen were troublesome in merchant ships and proved to be poor sailors, and that the libellant, if he engaged in the voyage, would find the service more severe than he anticipated, and become dissatisfied with his position. He was, however, accepted as one of the crew, and signed shipping articles for the voyage as a boy. He was stationed in the steerage with the carpenter and another boy, and was not put in the forecastle with the common sailors.

The old distribution of titles and rank amongst the ship's company [2] has, in respect to boys at least, gone into disuse in modern times. In American ships, cabin-boys, apprentices or pupils, and raw or green hands, are all rated as boys, without regard to their ages. The full-grown man, if not an ordinary seaman, ranks as a boy. Cabin-boys are usually attendants upon the master or steward, are regarded rather as servants than as mariners, and are rarely put to gen-

---

[2] The persons ordinary for sailing in ships have divers denominations: The first, which is the master, known to us and by most nations both now and of old, and especially by the Roman laws, "navicularius" or "magister navis"; in English rendered "master"; or "exercitor navis"; in the Teutonick "skipper"; by the Graecians, "navarchus" or "nauclerus"; by the Italians, "patrono." But this is only to those vessels that are ships of burden and of carriage; for to ships of war the principal there is commonly called "commander" or "captain." The next in order of office to the master, is he who directs the ship in the course of her voyage, by the French called "pilote"; by the English and Flemming, "steersman"; by the Romans, "gubernator"; by the Italians, "nochiero pilotto," and "navarchus," as Gerettus writes. The third is esteemed the master's mate or companion, chiefly if the master be steersman himself; of old by the Graecians and Romans called "proreta"; his charge is to command all before the mast. His successor in order is the carpenter or shipwright, by those two nations of old called "naupegus" by the latter; by the first "calaphates." From the loins of one of that rank sprang that great emperor Michael, surnamed "Calaphates," who denied not to own the quality of his father among his regal titles. The very name of "chalaphate"

eral ship's duty. It is otherwise with apprentices or pupils; but, as they serve under special articles or hiring, their cases come less under the supervision of the law maritime than those of other members of the crew. In this case, the libellant was a boy, in a general and nautical sense. He was a raw hand, and, having signed the shipping articles, was subject to the rules and authority of the ship, in every respect, according to his capacity and experience, the same as an ordinary seaman. The master might rightfully punish him for delinquencies, in the same manner as a common sailor, and, when the misfeasance was of a kind to call for personal chastisement, there was nothing in his position which exempted him from its infliction. Nevertheless, the effect of the infliction of unjustifiable punishment upon a delicate, educated and sensitive youth, and upon a hardy seaman, inured to rough usage from officers and from his messmates, would be widely different, and the consequences to the master for the wrongful act ought not to be the same. In my judgment, it is proved in this case, that personal chastisement was applied to the libellant in several instances, where no necessity is shown for its infliction. It was administered for very trivial delinquencies, if the acts or omissions of the libellant could be so termed, and abruptly, without calling the libellant to explain his conduct, or giving him an opportunity to offer apologies or amends for it. Nor did the master pronounce it faulty, so as to afford a caution to the libellant or the crew against its repetition. The correction administered was the only admonition given, and in this respect the method of instruction was the same that it would have been if the libellant had been an irrational animal. This was unwarranted in law. A master has no authority to fall upon a mariner with blows

the Venetian and Italian still use to this day. The next who succeeds in order, is he who bears the charge of the ship's boat, by the Italians called "brachierie"; by the Graecians and Romans, "carabita," from "carabus," which denotes the boat of a ship. The sixth in order, especially in ships of burden, is the clerk or purser, by the Italians called "scrivano"; whose duty is the registering and keeping the accounts of all received in or delivered out of the ship; for all other goods that are not by him entered or taken into charge, if they happen to be cast overboard in a storm, or are stolen or imbezzled, the master answers them not, there being no obligation on him by law for the same; his duty is to unlade by day, not night. The seventh, a most necessary officer, as long as there are aboard bellies, sharp stomachs and provision, called the "cook." The eighth is the ship's boy, who keeps her continually in harbours, called of old by the Graecians, "nauphilakes"; by the Italians, "guardino": These persons are distinct in offices and names, and are likewise distinguished in their hires and wages; the rest of the crew are under the common name of "mariners"; by the Romans called "nautae"; but the tarpollians, or those youths or boys that are apprentices, obliged to the most servile duties in the ship, were of old called "mesonautae." 1 Molloy, bk. 2, c. 3, pp. 341, 342.

for every inadvertency or act of misbehavior, unless the urgency to subdue him instantly or to resist some outrage threatened by him, be palpable. Nothing mutinous or violent or refractory, on either occasion, on the part of the libellant, is shown. I think it clear, upon the proofs, that the punishments complained of were exceedingly slight in kind, inflicted no injury upon the person of the libellant, and were only calculated to wound his pride and sensibilities. They do not, therefore, demand any startling reparation by damages, and, but for some circumstances peculiar to this case, the court would feel constrained to award little beyond costs and nominal damages. But the relation of the libellant to the master and to the ship presents considerations both of a general bearing and special to the case, which deserve notice. The government and discipline on board ships at sea being necessarily largely in the discretion of the master, courts can exercise little more supervision than to see that the discipline is administered temperately, and with reasonable regard to the capacity, constitution and feelings of the crew. Rice v. The Polly and Kitty [Case No. 11,-754]. If there arises a necessity for corporal restraint or punishment to individuals of the crew, the same measure of severity is not permitted towards the inexperienced, the feeble of frame or the improvident, as towards thoroughly trained, robust and perverse offenders. The libellant was under physical infirmities, of which the master was aware, which called for leniency and forbearance, if an order failed to be promptly and correctly fulfilled by him at the instant it was given. His eyesight was bad, he was of slender strength, he was timid in undertaking work which was strange to him, and he was awkward in learning. It should, accordingly, have been the occasion for careful teaching, or at most for reproof, if he failed to find or haul upon the right rope at once, or bungled in rigging up the pump, or went aloft clumsily or with hesitation, or was prone to cover himself with more clothing than was convenient to an easy and prompt action on duty, rather than for using a rope's end upon him, or boxing his ears, whether either produced bodily suffering or not. The offences set forth in the answer, in excuse of the corrections given to the libellant, appear to have been chiefly inadvertencies, or the results of ignorance, and his failure to lift at once the spar and sail for which he was struck across the back, if owing, in a degree, to the lack of a hearty good will for the work, must also be deemed, on the evidence, attributable in part to the weight of the spar and sail, compared with his actual strength. It appears to me, that every instance of misconduct or neglect alleged against the libellant was a fit subject for expostulation, caution or reproof by the respondent, and did not demand personal chastisement to correct the error or stimu-

late the libellant to a proper performance of his duties. If he was to be regarded and treated merely as a sailor, yet, as he was an educated and intelligent person, the master should have appealed to his reason and sense of right, to lead him to obedience, before resorting to blows.

The case presents another aspect, which should be adverted to. The libellant was making an experimental voyage, partly with a view to acquaint himself with navigation and the duties of a seaman, in order to qualify himself for that calling. It is of national concernment that the merchant marine should be supplied with men of intelligence and character, not only to officer the ship, but to fill every station on board of her. Nor is this consideration limited to the importance of having the ship's company made up of men competent, in every emergency, to navigate the vessel, and to deal intelligently with her lading, nor to the advantages to be derived by commerce and trade alone, from such a composition of a crew. Crews of American ships, if a creditable and true representation of American intelligence and morals at home, would abroad, wherever they went, become envoys more efficient than diplomacy or arms can send forth, in spreading arts, culture, religion and the love of peace and liberty. They would efface the disrepute attached, in a degree, to the calling of a sailor, and would render those who fill this vast field of enterprise on the high seas, common participators, in reputation and worth, with the merchants whose business they transact. The country has thus a deep interest in encouraging young men of capacity, ambition and good character, to seek employment in the merchant marine, and in having the ship of the merchant, like his counting-house, become to a school to his employés, for the culture of general intelligence and refinement of manners, together with a thorough knowledge of their special pursuit. The coarse and rude usage which the libellant received from the respondent is not, then, in my judgment, to be estimated solely by the consideration of the positive bodily harm which accompanied it; but the misconduct of the respondent is to be measured with some regard, also, to the broader interests, both those of navigation and those of a public nature, affected by it, in view of its tendency to deter sensitive and worthy young men from entering the merchant's service as mariners. Nor is it to be overlooked, that, in appreciating the wrong received from torts of the description proved in this case, the wound to the libellant's pride and self respect is entitled to weight, in determining the damages to be awarded him. Although, then, I hold the respondent acquitted of any wanton maltreatment of the libellant, and of any intentional cruelty towards him, and of any design to disgrace and humiliate him by the mode of punishment adopted, and although the actual injury received by him therefrom was inconsiderable,

and was not made matter of complaint on board, yet the respondent was culpably in fault in using force upon the libellant, on the occasions where moderate reproof and admonition or plain instruction to his inexperience was all the correction his delinquencies seem to have demanded. The humiliation and suffering to the libellant's feelings, in being subjected to corporal punishment, must have been greater than would have been experienced by a lad brought up roughly and with associates accustomed to like treatment; and this consideration will properly enter into the estimate of damages.

A master of a vessel, under the imputed authority of a parent over his crew, or even over mere boys under his charge, cannot claim the exemption or immunity which a father enjoys, to chastise a child at his discretion, without responsibility to the law, by punishments other than such as are cruel and injurious to the life or health of the child or are a public offence. On the contrary, a ship-master is liable directly to a minor for every personal tort committed upon him without legal justification. The considerations before suggested will, in this case, augment the damages beyond a mere remuneration for the bodily injury sustained by the libellant, but will not entitle him to vindictive or aggravated damages. I shall decree him $100 damages and his costs. Decree accordingly.