[Sac. No. 7868. In Bank. Jan. 25, 1971.]

JAMES A. GIBSON, a Minor, etc., Plaintiff and Appellant, v. ROBERT GIBSON, Defendant and Respondent.

## COUNSEL

Friedman & Collard, John M. Poswall and Morton L. Friedman for Plaintiff and Appellant.

Rust, Hoffman & Mills and Ellis J. Horvitz for Defendant and Respondent.

## OPINION

**SULLIVAN, J.**—We are asked to reexamine our holding in *Trudell* v. *Leatherby* (1931) 212 Cal. 678 [300 P. 7] that an unemancipated minor child may not maintain an action against his parent for negligence. That decision, announced 40 years ago, was grounded on the policy that an action by a child against his parent would "bring discord into the family and disrupt the peace and harmony of the household." (*Id.* at p. 680.) If this rationale ever had any validity, it has none today. We have con-

cluded that parental immunity has become a legal anachronism, riddled with exceptions and seriously undermined by recent decisions of this court. Lacking the support of authority and reason, the rule must fall.

James A. Gibson, plaintiff herein, is the minor son of defendant, Robert Gibson. James' complaint alleges in substance as follows. In January 1966 he was riding at night in a car which was being driven by his father and which was towing a jeep. His father negligently stopped the car on the highway and negligently instructed James to go out on the roadway to correct the position of the jeep's wheels. While following these directions, James was injured when another vehicle struck him.

Defendant filed a general demurrer on the theory that a minor child has no right of action against his parent for simple negligence.[1] Judgment of dismissal was entered on an order sustaining the demurrer without leave to amend. This appeal followed.

The doctrine of parental immunity for personal torts is only 80 years old, an invention of the American courts. Although the oft-compared rule of interspousal immunity reached back to the early common law, English law books record no case involving a personal tort suit between parent and child. (*Dunlap* v. *Dunlap* (1930) 84 N.H. 352, 356 [150 A. 905, 71 A.L.R. 1055]; Prosser, Torts (3d ed. 1964) § 116, p. 886; Annot. (1951) 19 A.L.R.2d 423, 425; see McCurdy, *Torts Between Persons in Domestic Relation* (1930) 43 Harv.L.Rev. 1030, 1059-1060.) Since children have long been allowed to sue their parents in matters involving property, however, some scholars have concluded that "there is no good reason to think that the English law would not permit actions for personal torts as well. . . ." (Prosser, *op. cit. supra*, § 116, p. 886 (citing Reeve, Domestic Relations (1816) p. 287; Eversley, Domestic Relations (3d ed. 1906) p. 578); *Dunlap* v. *Dunlap, supra*, 84 N.H. 352, 356.) Modern decisions in Scotland and Canada have recognized such personal injury suits. (*Young* v. *Rankin* (Scotland 1934) Sess. Cas. 499; *Deziel* v. *Deziel* (Canada 1953) 1 D.L.R. 651, 653-654; see Prosser, *op. cit. supra*, § 116, p. 886.)

In 1891, however, the Mississippi Supreme Court laid the egg from which parental immunity was hatched. Citing no authorities,[2] in *Hewlett* v. *George*

---

[1] We assume that James, whose age is not alleged, was unemancipated. Otherwise, his right to sue his father for personal injuries would be unquestionable under *Martinez* v. *Southern Pacific Co.* (1955) 45 Cal.2d 244, 253-254 [288 P.2d 868].

[2] Three earlier nineteenth century American cases had suggested that parental liability in tort might exist, at least in exceptional cases. In the earliest, *Gould* v. *Christianson* (S.D.N.Y. 1836) 10 Fed. Cas. 857 (No. 5636), a sea captain claimed immunity in an action for battery on the ground that he stood *in loco parentis* toward the 18-year-old seaman plaintiff. The court rejected the captain's defense, but went on to declare, in dictum, that a parent enjoyed immunity except for punishments which "are cruel and

(1891) 68 Miss. 703 [9 So. 885], the Mississippi court barred a minor daughter's false imprisonment action against her mother who had wrongfully committed her to an insane asylum. The court declared that the "peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society" would be disturbed by such an action and concluded that a child's only protection against parental abuse was to be found in the criminal law. (*Id.* at p. 711.) This "compelling" logic soon led the Washington Supreme Court to conclude that family peace and harmony would be irreparably destroyed if a 15-year-old girl were allowed to sue her father for rape. (*Roller* v. *Roller* (1905) 37 Wash. 242 [79 P. 788]; see also *McKelvey* v. *McKelvey* (1903) 111 Tenn. 388 [77 S.W. 664], upholding a demurrer to a minor's complaint seeking damages for "cruel and inhuman treatment" by her father and stepmother.)

Other states quickly adopted the rule of *Hewlett* and *Roller,* applying it to actions for negligence as well as for intentional torts, occasionally with more emotion than reason.[3] (See, e.g., *Mesite* v. *Kirchenstein* (1929) 109 Conn. 77 [145 A. 753]; *Sorrentino* v. *Sorrentino* (1928) 248 N.Y. 626 [162 N.E. 551]; *Wick* v. *Wick* (1927) 192 Wis. 260 [212 N.W. 787, 52 A.L.R. 1113]; *Elias* v. *Collins* (1926) 237 Mich. 175 [211 N.W. 88, 52 A.L.R. 1118]; *Matarese* v. *Matarese* (1925) 47 R.I. 131 [131 A. 198, 42 A.L.R. 1360]; *Small* v. *Morrison, supra,* 185 N.C. 577; *Taubert* v. *Taubert* (1908) 103 Minn. 247 [114 N.W. 763].)

*Trudell* v. *Leatherby, supra,* 212 Cal. 678, decided in 1931, involved an action by a minor plaintiff for damages for personal injuries sustained while a passenger in a car driven by his stepmother. After a discussion of barely one page on the issue of parental immunity, it was there concluded, "That a minor child, unemancipated by its parents, cannot sustain an action against its parents seems to be well settled by the authorities." (*Id.* at p. 680.) In support were cited "well considered" cases from eight states,

---

injurious to the life or health of the child or are a public offense." (*Id.* at p. 864.) In *Lander* v. *Seaver* (1859) 32 Vt. 114, a battery suit by a student against his teacher, it was stated, again in dictum, that a parent would be liable "in extreme cases of cruelty and injustice" for "malice or wicked motives or an evil heart in punishing his child." (*Id.* at p. 122.) *Nelson* v. *Johansen* (1885) 18 Neb. 180 [24 N.W. 730] held, without discussion of the issue, that a guardian *in loco parentis* to the 10-year-old plaintiff was liable for injuries resulting from negligence in failing to properly clothe her for the bitter winter weather. (See McCurdy, *supra,* 43 Harv.L.Rev. at pp. 1061-1063.)

[3]For example, the North Carolina Supreme Court declared of parental immunity: "If this restraining doctrine were not announced by any of the writers of the common law, because no such case was ever brought before the courts of England, it was unmistakably and indelibly carved upon the tablets of Mount Sinai." (*Small* v. *Morrison* (1923) 185 N.C. 577, 585-586 [118 S.E. 12, 31 A.L.R. 1135].)

and even a passage from *Hewlett* (as quoted in 20 R.C.L. 631). *Trudell's* only rationale was the threat of family discord.

No sooner had American courts, including our own, embraced the parental immunity doctrine than they began to fashion a number of qualifications and exceptions to it.[4] In *Martinez* v. *Southern Pacific Co., supra,* 45 Cal.2d 244, we allowed an *emancipated* minor to sue her parent for simple negligence; in *Emery* v. *Emery* (1955) 45 Cal.2d 421 [289 P.2d 218], we held that wilful or malicious torts were not within the scope of the immunity. Courts in other states compounded the doctrine's idiosyncrasies in decisions permitting tort actions by minors against the estate of a deceased parent (*Davis* v. *Smith* (3d Cir. 1958) 253 F.2d 286; *Dean* v. *Smith* (1965) 106 N.H. 314 [211 A.2d 410]; *Brennecke* v. *Kilpatrick* (Mo. 1960) 336 S.W.2d 68); against the parent in his business capacity (*Signs* v. *Signs* (1952) 156 Ohio St. 566 [103 N.E.2d 743]; *Borst* v. *Borst* (1952) 41 Wn.2d 642 [251 P.2d 149]; *Lusk* v. *Lusk* (1932) 113 W.Va. 17 [166 S.E. 538]; *Dunlap* v. *Dunlap, supra,* 84 N.H. 352); and against the parent's employer under *respondeat superior* for the tort of the parent within the scope of his employment.[5] (*Stapleton* v. *Stapleton* (1952) 85 Ga.App. 728 [70 S.E. 156]; *O'Connor* v. *Benson Coal Co.* (1938) 301 Mass. 145 [16 N.E.2d 636]; *Mi-Lady Cleaners* v. *McDaniel* (1938) 235 Ala. 469 [179 So. 908, 116 A.L.R. 639]; *Chase* v. *New Haven Waste Material Corporation* (1930) 111 Conn. 377 [150 A. 107, 68 A.L.R. 1497].) Although purporting to distinguish the situation of a negligence action directly against a living parent, such cases probably rested as much on growing judicial distaste for a rule of law which in one sweep disqualified an entire class of injured minors.

Apart from this general trend to restrict parental immunity, however, we believe that a trilogy of recent California cases in the area of intrafamily tort immunity has weakened, if not eroded, the doctrinal underpinnings of the rule. In *Emery* v. *Emery, supra,* 45 Cal.2d 421, we recognized the right of an injured minor to sue her father for wilful or malicious tort and to sue her brother for negligence. In *Self* v. *Self* (1962) 58 Cal.2d 683 [26 Cal.Rptr. 97, 376 P.2d 65] and *Klein* v. *Klein* (1962) 58 Cal.2d 692 [26 Cal.Rptr. 102, 376 P.2d 70], we abrogated *interspousal* immunity for

[4]See Comment, *Child* v. *Parent: Erosion of the Immunity Rule* (1967) 19 Hastings L.J. 201.

[5]California has avoided this inconsistency by denying an action in this situation, on the ground that the employer would have an indemnity right against the negligent parent, thus allowing the child to sue his parent indirectly. (*Myers* v. *Tranquility Irr. Dist.* (1938) 26 Cal.App.2d 385, 389-390 [79 P.2d 419].)

intentional and negligent torts.[6] We think that the reasoning of those decisions has totally destroyed two of the three grounds traditionally advanced in support of parental immunity: (1) disruption of family harmony and (2) fraud or collusion between family "adversaries." The third ground, the threat to parental authority and discipline, although of legitimate concern, cannot sustain a total bar to parent-child negligence suits. We shall examine these arguments one by one.

The danger to family harmony was the only rationale for immunity mentioned in *Trudell*. In *Self*, however, we termed this argument "illogical and unsound." Observing that spouses commonly sue each other over property matters, we concluded that "It would not appear that such assumed conjugal harmony is any more endangered by tort actions than by property actions. . . ." (58 Cal.2d 683, 690.)[7] Indeed, as we shall discuss, *infra*, the risk of family discord is much less in negligence actions, where an adverse judgment will normally be satisfied by the defendant family member's insurance carrier, than in property actions, where it will generally be paid out of the defendant's pocket. Since the law has long allowed a child to sue his parent over property matters (*King* v. *Sells* (1938) 193 Wash. 294 [75 P.2d 130]; *Lamb* v. *Lamb* (1895) 146 N.Y. 317 [41 N.E. 26]), the rationale of *Self* is equally applicable to parent-child tort suits.

We found the family harmony argument similarly unpersuasive in *Emery* when advanced to bar a suit between a minor sister and her minor brother. We said: "Exceptions to the general principle of liability (Civ. Code, § 3523 ['For every wrong there is a remedy.']) . . . are not to be lightly created, and we decline to create such an exception on the basis of the speculative assumption that to do so would preserve family harmony. An uncompensated tort is no more apt to promote or preserve peace in the family than is an action between minor brother and sister to recover damages for that tort." (45 Cal.2d 421, 430-431.)

Arguments based on the fear of fraudulent actions are also adequately answered by reference to *Emery, Self,* and *Klein*.[8] While some danger of

---

[6]See Bodenheimer, *Justice Peters' Contribution to Family and Community Property Law* (1969) 57 Cal.L.Rev. 577, 593, which suggested that *Emery, Self,* and *Klein* spelled doom for the parental immunity doctrine.

[7]One scholar in the field has remarked, "It is common knowledge that some of the most acrimonious family disputes have arisen in respect to property." (McCurdy, *supra,* 43 Harv.L.Rev. at p. 1075.) It would be anomalous for us to give greater protection to property rights than to personal rights. (See *Goller* v. *White* (1963) 20 Wis.2d 402, 410 [122 N.W.2d 193].)

[8]See also Report of the American Bar Association Special Committee on Automobile Accident Reparations at pages 85-86, which, while recognizing that there is some possibility of fraud, concludes that this danger is outweighed by the desirability of compensating injured minors for the automobile torts of their parents.

collusion cannot be denied, the peril is no greater when a minor child sues his parent than in actions between husbands and wives, brothers and sisters, or adult children and parents, all of which are permitted in California.[9] In short, as we stated in *Klein:* "The possibility of fraud or perjury exists to some degree in all cases. But we do not deny a cause of action to a party because of such a danger. . . . It would be a sad commentary on the law if we were to admit that the judicial processes are so ineffective that we must deny relief to a person otherwise entitled because in some future case a litigant may be guilty of fraud or collusion. Once that concept were accepted, then all causes of action should be abolished. Our legal system is not that ineffectual." (58 Cal.2d 692, 695-696.)

Moreover, we pointed out in *Emery* that concern with collusion is entirely inconsistent with the dire predictions of familial discord. The collusion argument assumes that the suit is in reality aimed not at the defendant family member but at his insurance carrier. In such case, the tort action poses no threat whatever to family tranquility; in fact, "domestic harmony will not be disrupted so much by allowing the action as by denying it." (Prosser, *op. cit. supra,* § 116, p. 889.) As we concluded in *Emery,* "The interest of the child in freedom from personal injury caused by the tortious conduct of others is sufficient to outweigh any danger of fraud or collusion." (45 Cal.2d 421, 431.)

The threat to parental authority and discipline is the only one of the traditional arguments for immunity which was not fully answered by *Self, Klein,* and *Emery.* "Preservation of the parent's right to discipline his minor children has been the basic policy behind the rule of parental immunity from tort liability." (*Emery* v. *Emery, supra,* 45 Cal.2d 421, 429.) Since *Self* and *Klein* dealt with suits between spouses, who are equals, we were not called upon to consider this issue. Nor does *Emery* adequately deal with this contention, for it involved parental misconduct which, because of its wilful or malicious character, forfeited all claim to immunity under the cloak of parental authority.

However, the absence of precedent on this point is not decisive. In our view, the possibility that some cases may involve the exercise of parental authority does not justify continuation of a blanket rule of immunity. In many actions, no question of parental control will arise. Thus, the parent who negligently backs his automobile into his child or who carelessly main-

---

[9]The Legislature has acted to bar suits in one situation where the danger of fraud and collusion was thought to be great—an action by an automobile guest against his host for simple negligence (Veh. Code, § 17158). (See *Klein* v. *Klein, supra,* 58 Cal.2d 692, 694, fn. 1.) This prohibition may eliminate some potential child-parent suits, which frequently involve injuries received by the child while a "guest" in an automobile driven by his parent.

tains a lawnmower, which injures the child, cannot claim that his parental role will be threatened if the infant is permitted to sue for negligence. To preserve the rule of immunity in such cases, where the reason for it fails, appears indefensible.

We do recognize, however, that issues of parental discretion and supervision will occasionally be raised when children sue their parents in tort. In such situations, some jurisdictions, although abrogating a broad doctrine of immunity (see *infra*), have nevertheless retained a limited one where basic parental functions are involved. For example, in *Goller* v. *White, supra,* 20 Wis.2d 402, the Wisconsin Supreme Court, while ending parental immunity in general, delineated two areas where immunity should remain: "(1) [w]here the alleged negligent act involves an exercise of parental authority over the child; and (2) where the alleged negligent act involves an exercise of ordinary parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care." (*Id.* at p. 413.)

We agree with this approach in its recognition of the undeniable fact that the parent-child relationship is unique in some aspects, and that traditional concepts of negligence cannot be blindly applied to it. ■ Obviously, a parent may exercise certain authority over a minor child which would be tortious if directed toward someone else. For example, a parent may spank a child who has misbehaved without being liable for battery, or he may temporarily order the child to stay in his room as punishment, yet not be held responsible for false imprisonment.

However, we reject the implication of *Goller* that within certain aspects of the parent-child relationship, the parent has carte blanche to act negligently toward his child. ■ As we noted in *Emery,* "Since the law imposes on the parent a duty to rear and discipline his child and confers the right to prescribe a course of reasonable conduct for its development, the parent has a wide discretion in the performance of his parental functions, but that discretion does not include the right wilfully to inflict personal injuries *beyond the limits of reasonable parental discipline."* (45 Cal.2d 421, 430.) (Italics added.) Although *Emery* involved *wilful* parental misconduct, we think this reasoning is applicable to a parent's *negligent* exercise of his familial duties and powers. In short, although a parent has the prerogative and the duty to exercise authority over his minor child, this prerogative must be exercised within reasonable limits. The standard to be applied is the traditional one of reasonableness, but viewed in light of the parental role. Thus, we think the proper test of a parent's conduct is this: what would an ordinarily reasonable and prudent *parent* have done in similar circumstances?

We choose this approach over the *Goller*-type formula for several reasons. First, we think that the *Goller* view will inevitably result in the drawing of arbitrary distinctions about when particular parental conduct falls within or without the immunity guidelines. Second, we find intolerable the notion that if a parent can succeed in bringing himself within the "safety" of parental immunity, he may act negligently with impunity.

In deciding to abrogate parental immunity, we are also persuaded by several policy factors. ▮ One is the obvious but important legal principle that "when there is negligence, the rule is liability, immunity is the exception." (*Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211, 219 [11 Cal.Rptr. 89, 359 P.2d 457].) As we stated in *Klein*, this fundamental doctrine of compensation for injury proximately caused by the act of another governs "in the absence of statute or compelling reasons of public policy." (58 Cal.2d 692, 695.) Of course, no statute requires parental immunity, and as we have already explained, public policy compels liability, not immunity.

Secondly, we feel that we cannot overlook the widespread prevalence of liability insurance and its practical effect on intra-family suits. Although it is obvious that insurance does not create liability where none otherwise exists (*Emery* v. *Emery, supra,* 45 Cal.2d 421, 431), it is unrealistic to ignore this factor in making an informed policy decision on whether to abolish parental negligence immunity. (See *Goller* v. *White, supra,* 20 Wis.2d 402, 412.) We can no longer consider child-parent actions on the outmoded assumption that parents may be required to pay damages to their children. As Professor James has observed: "Recovery by the unemancipated minor child against his parent is almost uniformly denied for a variety of reasons which involve the integrity of the family unit and the family exchequer and the importance of parental discipline. But in truth, virtually no such suits are brought except where there is insurance. And where there is, none of the threats to the family exists at all." (James, *Accident Liability Reconsidered: The Impact of Liability Insurance* (1948) 57 Yale L.J. 549, 553.)

By our decision today we join 10 other states which have already abolished parental tort immunity. We think it is significant that since 1963, when the Wisconsin Supreme Court drove the first wedge (*Goller* v. *White, supra,* 20 Wis.2d 402), other jurisdictions have steadily hacked away at this legal deadwood. Of particular interest from our viewpoint is *Hebel* v. *Hebel* (Alaska 1967) 435 P.2d 8, where the Alaska Supreme Court relied in part on our decisions in *Self* and *Klein*. Other states which now allow children to sue their parents in tort include Kentucky (*Rigdon* v. *Rigdon* (Ky. Dec. 18, 1970) 39 U.S.L. Week 2350); New Jersey (*France* v.

*A.P.A. Transport Corp.* (1970) 56 N.J. 500 [267 A.2d 490]); Arizona (*Streenz* v. *Streenz* (1970) 106 Ariz. 86 [461 P.2d 186]); New York (*Gelbman* v. *Gelbman* (1969) 23 N.Y.2d 434 [297 N.Y.S.2d 529, 245 N.E.2d 192]); Illinois (*Schenk* v. *Schenk* (1968) 100 Ill.App.2d 199 [241 N.E.2d 12]); Minnesota (*Silesky* v. *Kelman* (1968) 281 Minn. 431 [161 N.W.2d 631]); North Dakota (*Nuelle* v. *Wells* (N.D. 1967) 154 N.W.2d 364); and New Hampshire (*Briere* v. *Briere* (1966) 107 N.H. 432 [224 A.2d 588]).

Applying what we have said above to the case at bench, we hold that the trial court erred in sustaining the defendant's demurrer in reliance on *Trudell* v. *Leatherby.* ■ We overrule *Trudell,* and hold that an unemancipated minor child may maintain an action for negligence against his parent. Consequently, plaintiff's complaint stated a cause of action and was not vulnerable to demurrer.

The judgment is reversed and the cause is remanded to the trial court with directions to overrule the demurrer and to allow the defendant a reasonable time within which to answer.

Wright, C. J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

**McCOMB, J.**—I dissent. I would affirm the judgment.