**TERROR MINING COMPANY, INC. and David L. Roter, M.D., Petitioners,**

v.

**Alyssa ROTER and Amber Roter, Protected Persons by their Conservator, Stacy Margolin, Respondents.**

No. 92SC693.

Supreme Court of Colorado,
En Banc.

Jan. 10, 1994.

As Modified on Denial of Rehearing
Jan. 31, 1994.

Cooper & Kelley, P.C., Kay J. Rice, John R. Mann, Denver, for petitioners.

Feder, Morris, Tamblyn & Goldstein, P.C., Leonard M. Goldstein, Mark D. Thompson, Denver, for respondents.

Justice SCOTT delivered the Opinion of the Court.

In *Roter by Margolin v. Terror Min. Co.*, 847 P.2d 188 (Colo.App.1992), the Colorado Court of Appeals reversed the trial court's summary judgment and reinstated the tort claims brought by unemancipated minor children against their father. We granted certiorari in order to decide whether our parental immunity doctrine bars such claims. We reverse that part of the court of appeals' decision regarding the children's claims of willful and wanton misconduct, an exception to the parental immunity doctrine, but affirm that court's reversal of the trial court's summary judgment and reinstatement of the children's claims of negligence under the business or employment exception to the parental immunity doctrine.

## I

Petitioner David L. Roter, M.D. (Dr. Roter) incorporated Terror Mining Corporation, Inc. (TM) as a Colorado corporation in 1981 and was TM's only shareholder. TM was organized for the purpose of mining gold for commercial gain in Eldora, Colorado. Dr. Roter, who worked for TM on a part-time basis, was TM's only employee.[1]

On May 12, 1984, Dr. Roter was engaged in work activities in furtherance of TM's business. While so employed, Dr. Roter attempted to transport a large spool of mining cable from an upper driveway to a lower storage area using TM's Mercedes Unimog.[2] The Unimog was equipped with both a 1600 pound front end loader and a 2000 pound counterweight. The counterweight was secured to the posterior bed of the Unimog with a steel restraining band. Dr. Roter was the only person authorized to operate the Unimog and purportedly had extensive experience driving the vehicle.

After Dr. Roter had loaded the steel cable in the front end loader, his two daughters, Alyssa Roter and Amber Roter (the Roter children), who were then two and four years of age respectively, asked Dr. Roter if they could ride in the rear of the Unimog. Dr. Roter agreed and placed the Roter children in the rear bed of the vehicle. With the mining cable in place, he then proceeded to drive the Unimog down a gravel and dirt road that runs parallel to, and roughly thirty to forty feet above, a stream known as Boulder Creek. The road has a grade of approximately seven percent (7%).

Soon after Dr. Roter began driving the Unimog, the counterweight broke loose, propelling the counterweight forward. The resulting shift in the position of the counterweight threw the Unimog apparatus out of balance, causing Dr. Roter to lose steering

---

1. Dr. Roter, an orthopedic surgeon by profession, generally worked for TM on weekends.

2. A Mercedes Unimog is an off-road construction vehicle designed to accommodate multiple tasks including transporting heavy equipment to job sites, snowplowing, sweeping, front-end loading, trenching and backfilling. Much like a pick-up truck in appearance, the Unimog rides high above the ground on oversized tires. The Unimog has several attachments which can be fitted at the front, middle or rear of the vehicle.

control of the vehicle. Dr. Roter attempted to offset the shift in weight by lowering the front-end loader, however, this maneuver caused the Unimog to veer toward the edge of the road and toward the creek below. Unable to control the Unimog, Dr. Roter immediately jumped out of the vehicle and tried to rescue the Roter children from the rear of the Unimog. Before he could reach them, however, the Unimog ran over the edge of the road, whereupon the Roter children were thrown into Boulder Creek. As a result, the children sustained severe injuries.

## II

On June 11, 1990, by and through their mother and conservator, Stacy Margolin,[3] the Roter children filed suit in the district court to recover damages for all past and future medical expenses, pain and suffering, permanent disabilities, exemplary damages and for attorney fees and costs with interest. In their verified complaint, the Roter children specifically alleged that their injuries were "the direct and proximate result of Defendant Roter's negligence, carelessness and/or recklessness."

The defendants, Dr. Roter and TM, moved for summary judgment on the grounds that, there being no genuine issue of material fact as a matter of law, the tort action filed by the Roter children was barred under the doctrine of parental immunity. The Roter children argued in opposition to the motion that two exceptions to the parental immunity doctrine that have been adopted by this jurisdiction were applicable to this case, i.e., that Dr. Roter engaged in willful and wanton misconduct and that the incident arose out of Dr. Roter's pursuit of a business or employment activity. As such, the Roter children asserted that Dr. Roter was not protected under our parental immunity doctrine.

Finding the "events which led to the injuries" suffered by the children "undisputed," the district court entered summary judgment in favor of Dr. Roter and TM. That court granted the defendants' motion and dismissed all claims filed by the Roter children on the grounds that, first, the exception to the parental immunity doctrine that is based upon a finding of willful and wanton misconduct by a parent did not apply to the instant case, inasmuch as the Roter children failed to demonstrate a genuine issue of material fact and that their complaint "allege[d] no facts which could conceivably support a finding of willful and wanton or intentional misconduct." Additionally, the district court ruled that the business or employment exception to the parental immunity doctrine was inapplicable to this case because

> the parental immunity doctrine is a question of law for the court's determination [and g]iven the policy reasons for the doctrine, that determination can only be based on whether the children were under parental supervision of their father at the time of the injury. If they were, the doctrine applies even though the operative act of negligence ... was within the course and scope of a business activity.

Thus the district court also concluded that because Dr. Roter put his children in the flatbed of the Unimog "in the exercise of parental supervision," a decision that "had nothing to do with [his mining] business," as a matter of law, the doctrine of parental immunity barred the action brought against Dr. Roter.

Following the district court's entry of summary judgment in this matter, the Roter children appealed to the court of appeals. In *Roter by Margolin v. Terror Min. Co., Inc.*, 847 P.2d 188 (Colo.App.1992), the court of appeals reversed the trial court's summary judgment in favor of Dr. Roter and TM, first, on the ground that disputed material factual issues as to whether Roter's conduct was willful and wanton existed. The court of appeals' analysis on this issue is as follows:

> The record discloses that the [Roter children] alleged, both in their complaint and

---

**3.** Stacy Margolin initiated these proceedings pursuant to her authority as conservator in accordance with an order of the Probate Court of Boulder County. Under § 13–81–103(1)(a), 6A C.R.S. (1987), applicable to "persons under a disability," e.g., minor children, the two-year statute of limitations for filing tort claims is tolled until either the disability is removed or a legal representative such as a conservator is appointed by a probate court; *see also Tenney v. Flaxner,* 727 P.2d 1079 (Colo.1986).

in their submissions in opposition to summary judgment, a number of undisputed circumstances in support of their position that Roter's conduct went beyond simple negligence and constituted willful and wanton misconduct. Specifically, [they] cited their young age ..., their unrestrained position in the open rear bed of the Unimog, together with the fact that it was not designed to carry persons. They [also] note the danger resulting from their proximity to the insecurely fastened counterweight and the steep grade of the road being traveled. They likewise point out that, because of their positions relative to that of Roter while operating the machine, he could not get to them in case of an emergency.

*Roter*, 847 P.2d at 190. The court of appeals thus concluded that the Roter children alleged facts in the complaint and in opposition to the defendants' motion sufficient to support an inference that Dr. Roter's conduct fell within the "willful and wanton misconduct" exception to the parental immunity doctrine, and that as such, summary judgment was inappropriate.

Additionally, the court of appeals reversed the district court's ruling that Dr. Roter's actions did not fall within the limited business or employment exception to the parental immunity doctrine. In support of its judgment, the court of appeals noted that the record

discloses undisputed evidence in support of [the Roter children's] position that they were injured during [Dr.] Roter's exercise of his corporate duties. In this regard, [the Roter children] cite [Dr.] Roter's status as the sole shareholder of the corporation and his being the only authorized driver of the Unimog, which Roter had acknowledged was mostly used on the corporation's mining property. [The Roter children] bolster their position with [Dr.] Roter's admission that he was using the Unimog the day of the accident "in the furtherance of the corporation's business."

*Id.* The court of appeals concluded that these "undisputed facts, likewise, would be sufficient to support a reasonable factual inference that [the Roter children] were, indeed injured ... while [Dr. Roter] was engaged in [the] acts of his corporation...." *Roter*, 847 P.2d at 190–91. Accordingly, that court held that the trial court erred in entering summary judgment in favor of Dr. Roter because a genuine issue of material fact was raised by the Roter children.[4] *Roter*, 847 P.2d at 191.

We granted the petition for certiorari filed by Dr. Roter and TM in order to resolve the following two issues: (1) whether the court of appeals erred in holding that it reasonably could be inferred from the undisputed facts that Dr. Roter's conduct was willful and wanton, rendering summary judgment based on application of the parental immunity doctrine inappropriate; and (2) whether the business or employment exception to the parental immunity doctrine should apply when a parent is acting both in the course of employment and in a parental capacity. Because we find the record does not support a reasonable inference that Dr. Roter's conduct was willful and wanton, we reverse the court of appeals' holding that Dr. Roter's conduct was willful and wanton and instruct the court of appeals to reinstate summary judgment as to the first issue. However, inasmuch as Dr. Roter was engaged in business or employment activities at the time of the accident, we affirm the court of appeals' determination that summary judgment is inappropriate, as a matter of law, regarding the second issue. Thus, because the business or employment exception to our parental immunity doctrine applies to those acts arising out of occupational pursuits, such as those undertaken by Dr. Roter, we hold that Dr. Roter is excluded from the protection that might otherwise be accorded him under that doctrine.

### III

#### A. Qualified Parental Immunity

We recently reviewed the history and purpose of the doctrine of parental immunity in

---

**4.** The court of appeals also held that the district court's "dismissal of the claim against [TM] on summary judgment was improper," but that "the resolution of the factual issues concerning 'willful and wanton' and 'course of employment' may well be determinative of [TM's] liability here." *Roter by Margolin v. Terror Min. Co.*, 847 P.2d 188, 191 (1992).

*Schlessinger v. Schlessinger ex rel. Schlessinger,* 796 P.2d 1385 (Colo.1990). In *Schlessinger,* we noted that the doctrine of parental immunity was first announced in *Hewellette v. George,* 68 Miss. 702, 9 So. 885 (1891), *overruled by Glaskox ex rel. Denton v. Glaskox,* 614 So.2d 906 (Miss.1992), a case decided at the turn of the century wherein a minor child alleged false imprisonment against her parent for maliciously committing her to an insane asylum. In *Hewellette,* the Mississippi Supreme Court denied liability against the parent in order to preserve "the peace of society ... and to subserve the repose of families." *Hewellette,* 68 Miss. at 711, 9 So. at 887. In *Schlessinger,* we articulated additional bases for continuing to recognize the parental immunity doctrine. These include:

the maintenance of family harmony and tranquility; the preservation of legitimate parental authority and control of the children; the prevention of fraudulent or collusive suits between family members, especially when the parent is covered by liability insurance; and the safeguarding of family assets lest they be depleted in favor of one child at the expense of other children.

*Schlessinger,* 796 P.2d at 1387 (citations omitted).

Although we have acknowledged the foregoing purposes that underlie the parental immunity doctrine, we have long rejected a rule of absolute immunity and instead have adopted a rule of "qualified" parental immunity.[5] *See, e.g., Trevarton v. Trevarton,* 151 Colo. 418, 378 P.2d 640 (1963). In explaining our position with respect to the qualifications that can exempt a parent from immunity in tort actions, we referred, in *Schlessinger,* to two earlier cases[6] in which we discussed our reasons for adopting the "willful and wanton misconduct" and the "business or employment" exceptions to the doctrine of parental immunity. It is with the benefit of this precedent that we again address our exceptions to the parental immunity doctrine.

**B. The Willful and Wanton Misconduct Exception**

In *Horton v. Reaves,* 186 Colo. 149, 526 P.2d 304 (1974), we upheld the trial court's dismissal of a child's claim in simple negligence against a parent because "the liability of a parent can be predicated only upon wilful and wanton misconduct," *Horton,* 186 Colo. at 156, 526 P.2d at 308, but not simple negligence. Elaborating on this principle, in *Schlessinger* we stated that in contrast to simple negligence

willful and wanton misconduct involves a purposeful act or omission which the actor should have realized was dangerous to another but nonetheless was committed recklessly and without regard to the other's safety. When a parent engages in such misconduct and causes injury to the child, the parent's behavior *no longer is simply a failure to use reasonable care,* but rather takes on a character which the law is unwilling to tolerate and becomes a matter of public concern.

*Schlessinger,* 796 P.2d at 1388 (citations omitted and emphasis added).

Consistent with our view that willful and wanton misconduct connotes acts or omissions that extend beyond mere unreasonable-

---

**5.** The overwhelming majority of jurisdictions recognize exceptions to the parental tort immunity doctrine. Furthermore, more than one-half of the states have found that parents may be liable to their children for injuries caused by their negligence. See *Glaskox ex rel. Denton v. Glaskox,* 614 So.2d 906 (Miss.1992) for a comprehensive list of decisions wherein courts have adopted this view. In *Glaskox,* the court which first announced the doctrine, the Mississippi Supreme Court, rejected continued allegiance to its application. *Id. See also, Rousey v. Rousey,* 528 A.2d 416 (D.C.App.1987) (concluding that parental immunity is a vestige from a bygone era when children were without legal protection from their parents); *Nocktonick v. Nocktonick,* 227 Kan. 758, 611 P.2d 135 (1980) (holding that the only

disruption to family harmony is the injury, not the lawsuit that follows; collusion issue, moreover, is resolved by maintaining faith in the competence of trial judges to recognize and deal with such matters). The Restatement also recommends abolition of the doctrine (commenting that "[c]onstant criticism of the immunity has led to its erosion by the development of numerous exceptions to it ... until there are now very few jurisdictions if any, in which the immunity exists in any complete form"). Restatement (Second) of Torts § 895G cmt. d.

**6.** *See Horton v. Reaves,* 186 Colo. 149, 526 P.2d 304 (1974) and *Trevarton v. Trevarton,* 151 Colo. 418, 378 P.2d 640 (1963).

ness, other jurisdictions have limited this exception to cases wherein a parent causes injury to his or her child due to driving while intentionally intoxicated. *See, e.g., Attwood v. Estate of Attwood,* 276 Ark. 230, 633 S.W.2d 366 (1982) (holding where parent became willfully and intentionally intoxicated and drove vehicle with child as passenger while so intoxicated and at excessive speed, family immunity doctrine presents no bar to child's claim); *Winn v. Gilroy,* 296 Or. 718, 681 P.2d 776 (1984) (upholding wrongful death action where parent drove automobile while intoxicated with children as passengers); *see also,* Restatement (Second) of Torts § 895G cmt. e. ("A common application of the exception has been in the case of a parent who injures his child by his drunken driving of an automobile.").

■ In summary, before the willful and wanton misconduct exception removes the mantle of protection afforded a defendant under the parental immunity doctrine, the defendant's conduct must go beyond mere unreasonableness; it must be "purposeful" and committed without regard to the child's safety. *See also Steeves v. Smiley,* 144 Colo. 5, 9–10, 354 P.2d 1011, 1014 (1960) (concluding that where defendant pursues a highly hazardous course *with the knowledge that tragic consequences are highly probable,* defendant's conduct is reckless or wanton, and not merely negligent or careless); *Pettingell v. Moede,* 129 Colo. 484, 271 P.2d 1038 (1954) (holding ordinary or simple negligence should be considered as resulting from a passive mind, while a willful and wanton disregard is *the result of an active and purposeful intent* ); *Millington v. Hiedliff,* 96 Colo. 581, 45 P.2d 937 (1935) (recognizing that negligence has in it no element of willfulness, but involves a state of mind in which the person fails to give attention to the character of his acts or omissions or to weigh their consequences; in comparison, willful acts and omissions are *conscious acts,* the possible consequences of which are considered and present in the mind); section 13–21–

102(1)(b), 6A C.R.S. (1987) (establishing that willful and wanton conduct, for purposes of awarding exemplary damages, *"means conduct purposefully committed* which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to the consequences, or of the rights and safety of others") (emphasis added); Restatement (Second) of Torts § 500 ("wanton and willful misconduct" used by some courts "to refer to conduct intended to cause harm to another").

■ In their verified complaint as to the nature of Dr. Roter's culpability, the Roter children specifically alleged "negligence," or the "failure to exercise due care" in their first claim for relief against Dr. Roter; in their second claim for relief, the Roter children alleged "careless driving"; in their third and final claim for relief, they alleged "reckless driving." In the Roter children's filings in opposition to Dr. Roter's and TM's summary judgment motion, they offered no additional facts, by affidavit or counter affidavit, which we consider to be relevant and which reflect purposeful conduct on the part of Dr. Roter. Rather, the only conduct by Dr. Roter which is purported to give rise to these allegations includes "putting [the Roter children] in an open bed of a truck with a [2000] pound weight," [7] and "dr[iving the] vehicle in a careless and imprudent manner without due regard for the terrain and incline of the mountain property."

As discussed earlier, in order to fall within the scope of the willful and wanton misconduct exception to the parental immunity doctrine, the Roter children would need to allege in their complaint or assert in their response in opposition to Dr. Roter's motion, facts that would, at the least, raise an inference that when Dr. Roter placed his children in the bed of the Unimog for the purpose of transporting the spool of cable, he did so consciously, knowingly, with reckless disregard of, or intentionally having considered that the tragic consequences which occurred were

7. Although the complaint refers to the counterweight as weighing 500 pounds, the parties later agreed that it weighed one ton or 2000 pounds. In his deposition, Dr. Roter stated that the counterweight weighed approximately 2000 pounds; later, in their brief in opposition to Dr. Roter/TM's summary judgment motion, the Roter children also note that the counterweight weighed 2000 pounds.

"highly probable." *See Steeves, Pettingell* and *Millington, supra.*

Moreover, it is settled that a plaintiff opposing a defendant's summary judgment motion must counter statements of fact averred by the defendant and raise an inference sufficient to establish the existence of a genuine issue of material fact. C.R.C.P. 56; *Artes–Roy v. City of Aspen,* 856 P.2d 823 (Colo. 1993) (holding that when a motion for summary judgment is filed, an adverse party must set forth specific facts showing that a genuine issue of material fact exists for trial); *Trinity Broadcasting v. Westminster,* 848 P.2d 916, 925 n. 11 (Colo.1993) (noting that after moving party for summary judgment meets initial burden nonmovant bears burden of establishing that there is a triable issue of fact); *see also Klancher v. Anderson,* 113 Colo. 478, 158 P.2d 923 (1945).

Thus, where the record fails to show the existence of a genuine disputed factual issue, summary judgment is appropriate. *Civil Service Comm'n v. Pinder,* 812 P.2d 645 (Colo.1991) (movant for summary judgment can satisfy his burden of establishing nonexistence of genuine issue of material fact by demonstrating that there is an absence of evidence in the record to support non-moving party's case).

In the present case the facts are undisputed, and those facts neither establish nor imply that Dr. Roter's conduct was "willful and wanton," as we have defined that language. The only relevant allegation made by the Roter children on this point is that of "reckless driving," [8] and the facts they cite to support this allegation are limited to the following recitation: "By placing Plaintiffs in an open flatbed wherein a [2000] pound counterweight was situated, Defendant Roter acted in such a manner as to indicate wanton and willful disregard of the safety of Plaintiffs." We thus conclude that Dr. Roter's act of placing his children in the open flatbed of the Unimog while transporting a spool of cable, standing alone, is not a fact that suggests that he purposefully placed his children at risk for the tragic accident.

We therefore disagree with the court of appeals' holding that the facts alleged in the Roter children's complaint and their opposition to defendants' motion are sufficient to support an inference by a reasonable fact finder that Dr. Roter's conduct was "purposeful," and "in reckless disregard of [the Roter children's] safety." *Roter,* 847 P.2d at 190. From the pleadings alone, we cannot reasonably infer a state of mind, purpose, or desire of Dr. Roter to subject the Roter children to the risk of the harm suffered.[9] Moreover, the Roter children have failed to meet their obligations under Rule 56 in their opposition to the motion for summary judgment filed by the defendants. Thus we concur with the district court that while the facts alleged by the Roter children might suggest that Dr. Roter's conduct on the date of the accident was unreasonable or negligent, plaintiff children failed to sufficiently plead specific facts and support their opposition to the summary judgment motion so as to present a factual basis upon which a reasonable inference could be drawn that Dr. Roter purposefully pursued an activity that he had considered, more likely than not, would result in the tragic accident injuring the Roter children. *See* 6 Jeremy C. Moore et al., *Moore's Federal Practice* § 56.17[42] (2d ed. 1993) (while issues alleging negligence are not ordinarily susceptible to summary adjudication, summary judgment may be rendered

---

**8.** The Roter children's first and second claims for relief sound in ordinary negligence.

**9.** Comment b of the Restatement (Second) § 500 may be instructive here:

    b. Perception of risk. Conduct cannot be in reckless disregard of the safety of others unless the act ... is itself intended, notwithstanding that the actor knows of facts which would lead any reasonable [person] to realize the extreme risk to which it subjects the safety of others. It is reckless for a driver of an automobile intentionally to cross a through highway in defiance of a stop sign if a stream of vehicles is seen to be closely approaching in both directions, but if his failure to stop is due to the fact that he has permitted his attention to be directed so that he does not know that he is approaching the crossing, he may be merely negligent and not reckless. So too, if his failure to stop is due to the fact that his brakes fail to act, he may be negligent if the bad condition of the brakes could have been discovered by such an inspection as it is his duty to make, but his conduct is not reckless.

for defendant where the plaintiff fails to establish that the defendant's conduct rose to the level of wanton or willful conduct, a fact necessary for recovery). Because we are unwilling to extend liability under the willful and wanton misconduct exception of our parental immunity doctrine to unreasonable acts, thoughtlessness, or inattention, we reverse the court of appeals on this issue.

*C. The Business or Employment Exception*

In *Schlessinger* we also cited to *Trevarton, supra,* a case in which we discussed the second exception to the parental immunity doctrine and held that it was proper "to deny the parent's claim to immunity where the injuries are inflicted by the parent in the performance of duties relating to business as distinguished from parental duties." *Trevarton,* 151 Colo. at 423, 378 P.2d at 643. *See also Schlessinger* at 1387 (citing *Trevarton* for the proposition that "when a parent causes injury to a child in the performance of business or employment duties, there is no valid reason to deny the child a remedy in tort for the parent's negligence"). As we indicated in both *Trevarton* and *Schlessinger,* the reason for recognizing this exception is that parental duties *vis-a-vis* business undertakings are ordinarily distinct and exist independently of one another; as such, tort immunity predicated upon notions of the preservation of family harmony, domestic felicity, parental authority, and so forth, lacks either a logical or public policy justification for extension of the same immunity to activities which are sufficiently separate and distinct

from parental acts. *See Schlessinger,* 796 P.2d at 1387 (holding "a person's business or employment activities ... deserve no special protection under the mantle of parental immunity"); *Trevarton,* 151 Colo. at 423, 378 P.2d at 642 ("A rule which so incongruously shields conceded wrongdoing bears a heavy burden of justification.") (quoting *Badigian v. Badigian,* 9 N.Y.2d 472, 215 N.Y.S.2d 35, 174 N.E.2d 718 (1961) (dissenting opinion by Fuld, J.) (*overruled by Gelbman v. Gelbman,* 23 N.Y.2d 434, 245 N.E.2d 192 (1969); *Stamboulis v. Stamboulis,* 401 Mass. 762, 519 N.E.2d 1299 (1987) (where child was injured while at parent's place of business, family immunity doctrine will not protect parent because the prior distinction between motor vehicle and non-motor vehicle negligence has no rational justification); *see also* Note, *The "Reasonable Parent" Standard: An Alternative to Parent–Child Tort Immunity,* 47 U.Colo.L.Rev. 795 n. 3 (1976) (courts that recognize the "business or employment" exception to the parental immunity doctrine have done so on the ground that in these contexts, the existence of a parent-child relation is "merely fortuitous and thus, not a bar to an otherwise valid claim").

■ In the case before us, the Roter children assert, and Dr. Roter concedes, that Dr. Roter was an employee of TM, that he was the only authorized driver of the Unimog, that the Unimog was used primarily on the property of TM, and finally, that at the time of the accident he was engaged "in the furtherance of [TM's] business." [10] Based on

---

**10.** In his brief supporting his summary judgment motion, Dr. Roter asserts that because TM was "never a money making enterprise," and that on the day of the accident he "was under no business obligation to move the spool of cable," and finally, that he was not "provided any compensation for his activities," the business or employment exception to the parental immunity doctrine cannot apply. This argument is not persuasive. Dr. Roter also testified that TM was incorporated in July, 1981, that TM was organized and operated for profit, and that TM was then attempting to commercially exploit and benefit from the rising price of gold. There is no disagreement that TM was a *bona fide* corporation at the time of the accident. Under our corporate law, a corporation comes into existence as a corporation *de jure* upon the issuance of a certificate of incorporation, *Bowers Bldg. Co. v. Altura Glass Co., Inc.,* 694 P.2d 876 (Colo.App.1984), and without more, its existence is continuous; hence a defendant corporation cannot deny corporate status merely because such status becomes improvident, *Grand River Bridge Co. v. Rollins,* 13 Colo. 4, 21 P. 897 (1889); *see also Colorado Finance Co. v. B.F. Bennet Oil Co.,* 110 Colo. 1, 129 P.2d 299 (1942) (the cloak of corporate protection or liability may not be shed or donned to suit the personal whim or caprice of corporation's officers). That Dr. Roter considered the activities of TM to be at the time limited to a non-income producing weekend enterprise does not *ipso facto* transfigure his business corporation into a "hobby." *Contractors Heating & Supply Co. v. Scherb,* 163 Colo. 584, 432 P.2d 237 (1967) (holding that, standing alone, without evidence of fraud or some other wrong being perpetrated, *informalities in conduct of the business and affairs of the corporation* do not form basis for piercing corporate veil).

these undisputed facts, we agree with the court of appeals that the business or employment exception should be available to the Roter children, inasmuch as it is clear that Dr. Roter's actions were undertaken in the course and scope of his business undertaking or employment duties. While it is arguable that Dr. Roter was also engaged in the discharge of his parental duties when he permitted his children to ride in the back of the Unimog, we believe that this was a fortuitous circumstance, one which should not absolve Dr. Roter from his allegedly negligent conduct, nor deny the Roter children the right to recover appropriate damages, if ultimately proven. We further note that this case is factually analogous to *Trevarton,* and to the cases that we cited in support of our holding in that case. Finally, we believe that the principles established in *Trevarton* are directly applicable to the present dispute.

In *Trevarton,* an unemancipated minor child sought to recover damages from his father for the injuries he sustained as the result of the alleged negligence of his father. At the time of the accident, the father was engaged in cutting, felling and loading trees. The child was sleeping near the operation at the time, when a felled tree was dragged across him. In allowing the child to maintain the negligence action against his father, we joined the numerous other courts that "deny the parent's claim to immunity where the injuries are inflicted by the parent in the performance of duties relating to business as distinguished from parental duties." *Trevarton* 378 P.2d at 643.

Two cases we cited as authority to support the adoption of the business or employment exception involved situations in which minor children were injured as a result of their parents' negligent driving of motor vehicles in the scope and course of their business or employment. *See Worrell v. Worrell,* 174 Va. 11, 4 S.E.2d 343 (1939) and *Lusk v. Lusk,* 113 W.Va. 17, 166 S.E. 538 (1932). Both cases, in which the respective courts applied the business or employment exception, involved facts similar to those in the case before us; nei-

ther *Worrell* nor *Lusk* presented clear-cut factual distinctions between the discharge of the parents' duties and the furtherance of their business or employment activities. Thus we read *Trevarton* to extend to cases where a parent negligently causes harm to his or her child while engaged in acts within the course and scope of his or her business or vocation, regardless of whether the parent is also, technically speaking, supervising the activities of the child at the time. This approach eliminates the futility of inquiring into the degree of parenting present at the time of the negligently-caused injury. As we stated in *Schlessinger,*

> [i]t is virtually impossible in today's complex society to categorize with any degree of precision those activities which are at the core of the parental relationship from those that are not, just as it is equally difficult to identify those activities which are uniquely familial in character from those that are not. Our decisions in *Trevarton,* 151 Colo. 418, 378 P.2d 640, and *Reaves,* 186 Colo. 149, 526 P.2d 304, make clear that what is of legal significance in determining the cognizability of a child's tort claim against a parent is whether the claim ... arises out of the parent's pursuit of business or employment activities.

*Schlessinger,* 796 P.2d at 1390.

We therefore decline to engage in the futile attempt to "precisely categorize" parental duties, and instead hold that the dispositive issue is whether the parent's negligence arises out of the parent's pursuit of his or her business or employment activities, and not whether the parent was simultaneously engaged in conduct that theoretically could be classified as a parenting act.[11]

Accordingly, we find that the court of appeals was correct in concluding that because the record

> discloses undisputed evidence ... sufficient to support a reasonable factual inference that [the Roter children] were indeed, injured, as in *Trevarton v. Trevarton,* while their parent was engaged in acts of his corporation or of his employment by

---

11. To hold otherwise would render the business or employment exception illusory inasmuch as it could be argued that whenever one's children

are present, a parent is engaged in parenting activities.

the corporation ... a genuine issue of fact has been raised and summary judgment must be denied.

*Roter*, 847 P.2d at 190–91. The court of appeals' reversal of the district court's summary judgment on this issue is thus affirmed.

## IV

Because the Roter children did not set forth genuine issues of material fact as to whether Dr. Roter's actions constituted willful and wanton misconduct, summary judgment was properly entered for Dr. Roter and TM. As such, we reverse the court of appeals' judgment on this issue and remand to that court with directions to enter partial summary judgment in favor of Dr. Roter and TM. Because it is undisputed that Dr. Roter was engaged in employment activities in furtherance of a business enterprise at the time of the accident, however, we hold that the business or employment exception to our parental immunity doctrine should be available to the Roter children, and hence summary judgment in favor of defendants is inappropriate. We therefore affirm the court of appeals' determination that summary judgment is improper as to the issue of whether the business or employment exception to the parental immunity tort doctrine exempts Dr. Roter from the action brought by the Roter children.

The court of appeals' opinion is affirmed in part, reversed in part, and the case is returned to the court of appeals with directions to remand to the district court for further proceedings consistent with the views expressed herein.

ROVIRA, C.J., concurs in part and dissents in part, and VOLLACK, J., joins in the concurrence and dissent.

LOHR, J., concurs in part and dissents in part, and KIRSHBAUM, J., joins in that part of the dissent addressing part IIIB of the majority opinion.

KIRSHBAUM, J., specially concurs in part IIIC.

Chief Justice ROVIRA concurring in part and dissenting in part:

The majority concludes that sufficient evidence was presented to support the inference that Alyssa and Amber Roter (the children) were injured while their father was engaged in a business or employment activity and, therefore, the court of appeals correctly concluded that entry of summary judgment premised on the parental immunity doctrine was in error. Op. at 936–937. Because I disagree both with this conclusion, as well as the test utilized in reaching it, I respectfully dissent from Parts III(C) and IV of the majority opinion.

## I

The children were injured in 1984 as a result of an accident that occurred while their father, Dr. David L. Roter (Roter), was operating a front-end loader (the Unimog) used to transport a spool of mining cable. The mining cable and the Unimog were materials used while conducting the operations of the Terror Mining Co., of which Roter was the sole shareholder and employee.

The activities at issue here took place on a Saturday at the Roters' home and the children were present while their father undertook those activities. Roter was the only adult at home with his children at the time of the accident. The children asked if they could ride in the Unimog as he drove it down a hill, and he agreed to give them a ride. They were then placed in the rear bed of the vehicle. In the course of driving the Unimog from their home to a storage area, Roter lost control of the vehicle and as a result, the children were thrown off.

Six years later, in June 1990, Stacy Margolin, the children's mother and conservator, brought an action in tort against their father and Terror Mining Co. The defendants moved for summary judgment on the grounds that the suit was barred by the doctrine of parental immunity. The trial court, in granting the motion, held that the business or employment exception to the parental immunity doctrine was inapplicable because the children were injured while Roter exercised parental supervision over them.

Thus, the trial court concluded that the parental immunity doctrine "applies even though the operative act of negligence (in this case driving the Unimog) was within the course and scope of a business activity."

The court of appeals reversed, concluding that "[t]he record ... discloses undisputed evidence in support of plaintiffs' position that they were injured during Roter's exercise of his corporate duties." *Roter by Margolin v. Terror Mining Co., Inc.*, 847 P.2d 188, 190 (Colo.App.1992).

## II

The majority concludes that summary judgment is inappropriate because sufficient evidence was presented to support the inference that the children were injured while their father was engaged in a business or employment activity. In reaching this conclusion, the majority holds that the dispositive issue under the business or employment exception to the parental immunity doctrine is "whether the parent's negligence arises out of the parent's pursuit of his or her business or employment activities...." Op. at 937.

Formulating the business or employment exception to the parental immunity doctrine in these terms not only ignores the limits to this exception set forth in the precedent of this court, but broadens the exception to such an extent that the exception can no longer be squared with the rationales which originally gave rise to its adoption.

## A

The business or employment exception to the parental immunity doctrine was first recognized by this court in *Trevarton v. Trevarton*, 151 Colo. 418, 378 P.2d 640 (1963), where we stated that "[m]any courts deny the parent's claim to immunity where the injuries are inflicted by the parent in the performance of duties relating to business as distinguished from parental duties. We concur in the views of such courts." *Id.* at 423, 378 P.2d at 643. The exception for injuries inflicted in the course of a parent's performance of business duties, as distinguished from injuries resulting from the performance of parental duties, was applicable under the facts of *Trevarton* because there, "the parent was engaged in his business or employment and ... his alleged negligent acts had nothing to do with the discharge of parental duties." *Id.* at 422, 378 P.2d at 642.

Thus, from its very inception, the business or employment exception to the parental immunity doctrine was regarded as applicable only when the parent was engaged strictly in the discharge of business or employment duties, *i.e.,* where the injuries were in no way the result of the discharge of parental duties. This limitation was again emphasized in the only other opinion of this court addressing this exception to the parental immunity doctrine.

In *Schlessinger v. Schlessinger,* 796 P.2d 1385 (Colo.1990), we considered whether "the Auto Accident Reparations Act abrogate[d] the parental immunity doctrine where ... the child's claim sounds in simple negligence and requests money damages for personal injuries allegedly caused by the parent's operation of a motor vehicle during an activity unrelated to the parent's business or employment." *Id.* at 1386. In the course of concluding that the Act did not abrogate the doctrine of parental immunity, we considered the business or employment exception to that doctrine. While the formulation of the exception in *Schlessinger* appears nearly identical to the formulation adopted by the majority, the majority has eschewed the limiting principle to that exception which was explicitly acknowledged by the court in *Schlessinger.* Compare *Schlessinger,* 796 P.2d at 1390 *with* op. at 938.

In stating that "what is of legal significance in determining the cognizability of a child's tort claim against a parent is whether the claim ... arises out of the parent's pursuit of business or employment activities," *Schlessinger,* 796 P.2d at 1390, we expressly stated that this standard provides legal redress "for negligent conduct separate and distinct from the parental relationship...." *Id.*

Thus, the majority, in adopting the "arising out of" test set forth in *Schlessinger,* without its concomitant limitation that that

conduct be "separate and distinct from the parental relationship," has ignored the limitation imposed on the business or employment exception to the parental immunity doctrine previously adopted by this court and recognized in other jurisdictions. For example, in *Barlow v. Iblings*, 261 Iowa 713, 156 N.W.2d 105, 113 (Iowa 1968), *overruled on other grounds by, Turner v. Turner*, 304 N.W.2d 786 (Iowa 1981), a child was injured in a meat grinder at his father's cafe. The court held that although the father clearly was engaged in an employment activity, parental immunity applied because that activity was not sufficiently distinct from the father's role as a parent:

> Here, the injury occurred at the parents' cafe where the father had often taken his small son while he performed some task at the establishment. There is no contention the son was an employee or had come to the cafe by himself. He was under the care and direction of his father at all times material to this action, and at no time could it be said the relationship of parent and child had changed to some other recognized relationship. Theirs was personal in nature. It is not alleged that this relationship had changed in any way from that existing in the home.[1]

Similarly, in *Davis v. Grinspoon*, 212 Ill. App.3d 282, 156 Ill.Dec. 520, 570 N.E.2d 1242 (1991), the court granted summary judgment under the parental immunity doctrine because the father's conduct as an employee was intertwined with his role as a parent. While driving from one work site to another, the father saw his family and pulled over to greet them. Upon pulling away, he ran over his daughter, causing her death. In affirm-

ing the entry of summary judgment based on parental immunity, the court rejected the argument that the father no longer occupied a parental relationship vis-a-vis his daughter because he had resumed his work-related activities: "[t]he entire circumstance which culminated in decedent's accidental death was clearly within the family relationship." *Id.* 156 Ill.Dec. at 523, 570 N.E.2d at 1245. *See also Shell Oil Co. v. Ryckman*, 43 Md. App. 1, 403 A.2d 379 (1979); *Borst v. Borst*, 41 Wash.2d 642, 251 P.2d 149 (1952).[2]

I do not, of course, disagree with the majority opinion simply because it represents an expansion of a common law rule. To the contrary, I acknowledge that frequently the logical progression of the common law will warrant the expansion of unduly restrictive rules. However, expanding this rule in this way broadens the business or employment exception to the parental immunity doctrine to such an extent that it can no longer be squared with the reasons which originally gave rise to its adoption. Further, the justifications which the majority offers for expanding this rule in no way supports the test the majority adopts.

### B

In *Schlessinger*, we observed that:

> The rationale for the "business or employment" exception to parental immunity is that a person's *business or employment activities usually are sufficiently separate and distinct from the person's role as parent* and, as such, deserve no special protection under the mantle of parental immunity. Moreover, in light of the fact that a child generally may assert a cognizable

---

**1.** The *Turner* court, while overruling *Barlow*, affirmed that portion of the *Barlow* opinion relied on here, by stating that "outside the area of parental authority and discretion, unemancipated minor children are not barred by the immunity doctrine from suing their parents for negligence torts." *Turner*, 304 N.W.2d at 789.

**2.** While the majority appears to recognize this traditional limitation of the business or employment exception, it pays little more than lip service to it. For instance, the majority feels compelled to note that "it is arguable that Dr. Roter was also engaged in the discharge of his parental duties when he permitted his children to ride in the back of the Unimog." Maj. op. at 20. This

fact is, however, completely irrelevant to the determination of liability under the majority's test. Not only does the majority recognize this "arguable" fact, however, it explains its irrelevance by asserting that "this was a fortuitous circumstance...." *Id.* I must confess that I can discern nothing fortuitous in the fact that Roter was engaged in parental duties while he was with his children, at their home, on a Saturday, and the only adult present to supervise them. If anything, the fortuitous fact here is that while supervising his children at their home, he decided to drive the Unimog down the driveway and to give his kids a ride while doing so.

claim against a parent in matters pertaining to contract or property rights, there seems to be little reason to preclude a child's claim against a parent for injuries arising out of occupational pursuits which are *unrelated to and exist independently of the parental relationship.*

*Schlessinger,* 796 P.2d at 1387 (emphasis added) (citations omitted). As this language makes clear, both of the rationales offered in support of this exception apply only when the parent's activities are "sufficiently separate and distinct" or "unrelated to and exist[ ] independently of the parental relationship." *Id.* In concluding that these requirements are no longer necessary for invoking the business or employment exception, the majority permits the exception to swallow the rule.

This can be illustrated by considering two hypothetical examples. Imagine, for instance, that an attorney's child is sick and cannot attend day-care. The parent decides that she will work at home that day, so that she may supervise and care for her child while also attending to her professional obligations. While the parent is absorbed in writing a brief, her child is injured. Assume further, that the injury is the proximate result of the parent's negligent supervision. Under the test announced today, the parental immunity doctrine would not be applicable because her negligence would have arisen out of her concentration and undivided attention to her work. If, on the other hand, the attorney stayed home with her child, left her work behind, but became similarly captivated by a television program, application of the parental immunity doctrine would be appropriate.

Or, imagine that Roter had attached a lawn cutting mechanism to the Unimog. While he was supervising his children at their home, they asked if they could ride on the Unimog as he returned it to the storage shed down the hill from their home. If, under these circumstances, the children were injured as a result of an accident, the parental immunity doctrine would be applicable—assuming that the grass cut with the Unimog was at the Roters' home. If, on the other hand, Roter cut the grass surrounding their home and also cut some grass surrounding a Terror Mining Co., Inc. building, then the doctrine would not be applicable.

In my opinion, these and countless other examples that could be imagined serve only to point out the fact that often, the line between business or employment activities and parental activities is far from clear. Indeed, given contemporary economic and familial realities, it is safe to assume that many people balance the obligations of parenting and careers simultaneously. In light of this recognition, it is illogical to conclude that the parental immunity doctrine is inapplicable so long as the negligent act arises out of a person's business or employment activities—without regard to the extent to which those activities are intertwined with the discharge of parental duties.

The mantle of parental immunity should not insulate conduct which is unrelated to a person's role as parent. *Schlessinger,* 796 P.2d at 1390. "Because the immunity ostensibly protects the family relationship, it is no longer necessary when that relationship ceases to exist." Gail D. Hollister, *Parent–Child Immunity: A Doctrine in Search of Justification,* 50 Fordham L.Rev. 489, 509 (1982). Simply put, parental immunity should not be granted in circumstances where it cannot be justified.

In *Schlessinger,* we recognized several justifications for the parental immunity doctrine including:

> [T]he maintenance of family harmony and tranquility; the preservation of legitimate parental authority and control of the children; the prevention of fraudulent or collusive suits between family members, especially when the parent is covered by liability insurance; and the safeguarding of family assets lest they be depleted in favor of one child at the expense of other children.

*Schlessinger,* 796 P.2d at 1387 (citations omitted). In my judgment, these rationales are as valid today as they were when we first recognized them in *Schlessinger.* Evidently, the majority shares this view as it neither suggests that the parental immunity doctrine should be abolished nor posits any other rationales in support of such immunity.

942

It is, however, "possible for a parent to take on additional roles with respect to his child and to be held liable because the child is not injured by the parent acting as a parent." Gail D. Hollister, *Parent–Child Immunity: A Doctrine in Search of Justification*, 50 Fordham L.Rev. 489, 510 (1982). In circumstances where a parent, though obviously continuing to be a "parent," injures his or her child through an act of negligence which is wholly unrelated to that person's status as a parent, the rationales which support parental immunity lose their validity.

For example, if a child is injured as a result of conduct unrelated to parental conduct, insulation from liability cannot be premised on the need to preserve the legitimate parental authority and control of the children, because parental authority and control simply are not implicated in such circumstances. Similarly, the need to maintain family harmony, discourage collusive or fraudulent suits, and safeguard family assets are all diminished in the context of occupation-related negligence because often times the ultimate liability for such conduct and responsibility for defending against actions seeking damages, will fall on someone or some entity other than the parent.

Where, however, the parent-child relationship is maintained (regardless of whether the parent is also acting in some other role), all of the policy justifications which support the parental immunity doctrine are fully applicable and should be given effect. Accordingly, abrogation of parental immunity under the business or employment exception can be justified only when the business or employment conduct is "separate," "distinct," "unrelated to," and "exists independently of" the person's role as a parent.

### C

The majority frees itself from the traditional limitations of the business or employ-

ment exception by relying on two justifications, neither of which lend any support to its holding. First, the majority asserts that its newly adopted test "eliminates the futility of inquiring into the degree of parenting present at the time of the negligently-caused injury." Op. at 937. While this is undoubtedly true, it is equally true that such a "futile" inquiry is not required under the business or employment exception as set forth in *Schlessinger:* if a parent is engaged in both a business activity and the discharge of parenting duties—to any degree—then the business or employment exception is inapplicable. Quantifying the "degree of parenting" simply is not required under *Schlessinger.*[3] In essence then, the majority has sought to justify the adoption of its new test on the grounds that it avoids a problem which is non-existent. As the trial court correctly observed, there "is no authority from this jurisdiction or any other suggesting that the trier of fact should weigh the extent to which he [the parent] was engaged in business duties against the extent to which he was engaged in parental duties."

The majority also attempts to justify its rejection of the traditional limitations of the business or employment exception on the grounds that the limitation "render[s] the business or employment exception a nullity inasmuch as it could be argued that whenever one's children are present, a parent is engaged in parenting activities." Op. at 937 n. 11.

In my judgment, neither the common law nor common sense supports the proposition that anytime a child is in the presence of his or her parent, the parent is engaged in a parenting act. One need not strain the imagination to see that myriad situations can and do arise in which a parent is in the presence

**3.** Oddly, the majority cites *Schlessinger* itself in support of the conclusion that its adopted test avoids "the futility of inquiring into the degree of parenting present...." Op. at 937–938. While we recognized in *Schlessinger* that "[i]t is virtually impossible in today's complex society *to categorize* with any degree of precision those activities which are at the core of the parental relationship," *Schlessinger*, 796 P.2d at 1390 (emphasis added), this statement has nothing to do

with the "futility" argument made by the majority. Rather, this statement simply explains our rejection of the test adopted by "some courts [which] have limited the parental immunity doctrine to parental behavior that is inherent in the parental relationship or is in furtherance of a familial purpose." *Id.* (citing *Schenk v. Schenk*, 100 Ill.App.2d 199, 241 N.E.2d 12 (1968) and *Goller v. White*, 20 Wis.2d 402, 122 N.W.2d 193 (1963)).

of his or her children, without occupying a parental role for purposes of the business and employment exception to the parental immunity doctrine. Indeed, the law of other states is replete with examples of precisely such circumstances. *See, e.g., Dzenutis v. Dzenutis,* 512 A.2d 130, 136 (Conn.1986) (son burned when he tripped over hot tar bucket which father left on sidewalk next to work site, where "[t]he mishap might well have occurred to any other member of the public who passed that way," no parental immunity); *Felderhoff v. Felderhoff,* 473 S.W.2d 928 (Tex.1971) (minor injured during his employment on ranch where his father was foreman; accident occurred wholly outside sphere of father's parental duties and responsibilities and therefore, no parental immunity); *Signs v. Signs,* 156 Ohio St. 566, 103 N.E.2d 743 (1952) (father acting only in business capacity when his child was burned by a fire at father's gasoline pump; no parental immunity); *Borst v. Borst,* 41 Wash.2d 642, 251 P.2d 149 (1952) (father, in the course of employment, ran into son while driving automobile; relationship one of driver-pedestrian not parent-child, no parental immunity); *Worrell v. Worrell,* 174 Va. 11, 4 S.E.2d 343 (1939) (child injured while passenger on bus owned and operated by her father, no parental immunity because injuries occasioned in the performance of employment duties, not in the parental relation). In short, the reasoning offered by the majority in support of its refusal to apply the traditional requirements of the parental immunity doctrine rests on incorrect assumptions about the nature and extent of the parent-child relationship in this context.

Maintaining the traditional requirements that business or employment activities must be sufficiently separate and distinct from a person's activities as a parent would not abrogate the exception. To the contrary, it would maintain the exception in a way that would render it (1) supported by the rationales offered in its behalf, and (2) backed by the precedent of this court adopting and applying the exception.

## III

Properly construed, the business or employment exception to the parental immunity doctrine is not applicable under the facts of this case. As the trial court correctly observed:

The children were under the father's care and direction at all times. The children were on the Unimog because their father put them there. He put them there in the exercise of parental supervision. They did not get there on their own volition or because the father, as an employee of a business, made a negligent decision in the course of his employment. His decision to put them there had nothing to do with the business, at least within the context of this issue.

Plaintiffs do not allege, nor do the facts suggest, that Roter and his daughters occupied anything other than a parent-child relationship on the day of the accident. Roter's activities with respect to the business of Terror Mining were incidental to that relationship, and it is that very relationship which provides the exemption to the general duty of due care afforded by the doctrine of parental immunity.[4]

In short, if the traditional requirement is maintained that business or employment activities be sufficiently separate and distinct from a person's parental duties before the exception could apply, there is no doubt that the evidence presented could not support the reasonable inference that Roter's activities were sufficiently separate and distinct from his parenting activities. Roter was supervising his children at their home. He took them for a ride on the Unimog not as any operator of a mine would have done under the same circumstances, but as a father whose children asked him to take them along.

Accordingly, I dissent from Parts III(C) and IV of the majority opinion.

I am authorized to say that Justice VOLLACK joins in this concurrence and dissent.

---

**4.** These conclusions of the trial court comport with the children's admission contained in their verified complaint that at all times relevant to

this incident, they "were in the supervision, care, custody, and control of their father, David L. Roter."

Justice LOHR concurring in part and dissenting in part:

I concur with the majority in its affirmance of the court of appeals' reversal of the trial court's summary judgment regarding the business or employment exception to the parental immunity doctrine. However, I believe the record discloses a genuine issue of material fact as to whether Roter's conduct was willful and wanton. I would therefore affirm the court of appeals' decision reinstating the children's claims under the willful and wanton misconduct exception. Accordingly, I respectfully concur in part and dissent in part.

A court may grant a motion for summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." C.R.C.P. 56(c). As this court has often noted, summary judgment "is a drastic remedy and should be granted only upon a clear showing that there is no genuine issue as to any material fact...." *Peterson v. Halsted,* 829 P.2d 373, 375–76 (Colo.1992). "In determining whether summary judgment is proper, the nonmoving party is entitled to the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts, and all doubts must be resolved against the moving party." *Id.* at 376 (citations omitted). In the present case, the children's verified complaint and the depositions they relied upon in their brief in opposition to the summary judgment motion of Roter and Terror Mining Company support a reasonable inference that Roter acted willfully and wantonly and thus create a genuine issue of material fact.

Willful and wanton misconduct requires "a purposeful act or omission which the actor should have realized was dangerous to another but nonetheless was committed recklessly and without regard to the other's safety." *Schlessinger v. Schlessinger,* 796 P.2d 1385, 1388 (Colo.1990).[1] This standard includes two important elements. The first requires

---

1. Because the majority opinion recites a number of different definitions for willful and wanton conduct, I am unable to discern what standard the majority intends to adopt for evaluating when conduct that deviates from the standard of conduct that a reasonable person would observe is willful and wanton. By attempting an exegesis of the standard that we set forth in *Schlessinger,* the majority has cast that standard into doubt. Compare the following, for example:

> (1) " '[W]illful and wanton misconduct involves a purposeful act or omission which the actor should have realized was dangerous to another but nonetheless was committed recklessly and without regard to the other's safety.' " Op. at 933 (quoting *Schlessinger,* 796 P.2d at 1388).
> (2) "[I]n order to fall within the scope of the willful and wanton misconduct exception to the parental immunity doctrine, the Roter children would need to allege ... facts that would ... raise an inference that when Dr. Roter placed his children in the bed of the Unimog ... he did so consciously, knowingly, with reckless disregard of, or intentionally[,] having considered that the tragic consequences which occurred were 'highly probable.' " Op. at 934–935.
> (3) "Dr. Roter's act of placing his children in the open flatbed of the Unimog while transporting a spool of cable ... is not a fact that suggests that he purposefully placed his chil-

dren at risk for the tragic accident." Op. at 935.
> (4) "[W]e cannot reasonably infer a state of mind, purpose, or desire of Dr. Roter to subject the Roter children to the risk of the harm suffered." Op. at 935.
> (5) "[P]laintiff children failed to ... present a factual basis upon which a reasonable inference could be drawn that Dr. Roter purposefully pursued an activity that he had considered, more likely than not, would result in the tragic accident injuring the Roter children." Op. at 935.

The standard intended to be applied is further obscured by the majority's citation at page 934 to the holdings of a number of our cases, each of which preceded *Schlessinger.* Accentuation of these earlier cases is confusing. One of the cases is noted to have concluded that a defendant's conduct is reckless or wanton where a defendant pursues a highly hazardous course with the knowledge that tragic consequences are "highly probable." Another is said to have found that willful and wanton disregard is the result of an "active and purposeful intent." In addition, citing the Restatement (Second) of Torts, the majority points out that wanton and willful misconduct is used by some courts to refer to conduct "intended to cause harm to another."

In absence of the articulation of a clear and definite standard, it is difficult to understand how the majority can assess whether there is a disputed issue of material fact.

that the actor "purposefully" act or fail to act. Although there is some suggestion that a purposeful act must involve a conscious weighing of consequences, *see, e.g., Millington v. Hiedloff,* 96 Colo. 581, 586–87, 45 P.2d 937, 939 (1935), the better view is that to be purposeful an act need only be voluntary and intentional. *See Steeves v. Smiley,* 144 Colo. 5, 10, 354 P.2d 1011, 1014 (1960) (quoting a previous opinion that stated: "[He] was doing exactly what he intended to do. His conduct ... was not the result of an untoward or unanticipated event; his conduct was wilful (defined by Webster as 'self-determined,' 'voluntary,' 'intentional')."); *Pettingell v. Moede,* 129 Colo. 484, 491, 271 P.2d 1038, 1042 (1954) ("Willful action means voluntary; by choice; intentional; purposeful."). In the present case, Roter does not dispute that he intentionally loaded the cable spool on the front end loader, that he intentionally placed his two children with the 2000 pound counterweight in the rear bed of the Unimog, and that he intentionally drove the Unimog down the inclined road. His intention here is sufficient to satisfy the requirement of purposeful action.

A second important element included in the *Schlessinger* standard requires that the actor realize his act or omission presents a danger to others, so that to proceed in the face of such known danger evinces recklessness and disregard for the safety of others. *Schlessinger,* 796 P.2d at 1388. Even assuming that this requirement represents a subjective rather than objective test,[2] the facts of this case present a genuine factual issue concerning Roter's awareness of the dangers involved in his actions.

The original verified complaint alleged that Roter placed his two year old and four year old daughters on the open bed of the Unimog with the counterweight and that he subsequently drove the truck in such a way as to cause it and his two daughters to fall thirty-five feet into Boulder Creek. In their brief

in opposition to the motion for summary judgment filed by Roter and Terror Mining Company, the children properly relied in part on Roter's deposition. *See* C.R.C.P. 56(c). The brief notes that Roter stated in the deposition that he had no training on the use of the Unimog with the front end loader attached. He also stated that at the point where the Unimog left the road, the road was approximately ten feet wide while the bed of the Unimog was between six and seven feet wide. Roter testified that Boulder Creek, into which his daughters fell, was several feet deep and flowing rapidly with spring runoff. Finally, Roter stated that the road had a grade somewhat less than seven percent. From these facts, a reasonable inference could be made that Roter was aware of the danger in which he placed his children and that proceeding in the face of such awareness evinced recklessness and disregard for the children's safety.

Therefore, I conclude that the record presents a genuine issue of material fact in regard to whether Roter's conduct was willful and wanton. I would thus affirm the court of appeals' decision reinstating the children's claims based upon this exception to the parental immunity doctrine as well as that court's reinstatement of the claims based upon the business or employment exception. Accordingly, I concur in part and dissent in part.

Justice KIRSHBAUM specially concurring in part and dissenting in part.

I concur in the conclusion reached by the majority in Part III C of its opinion that the negligence claims asserted by the plaintiff against the defendants are not barred in the circumstances of this case. I join Justice Lohr's dissent to Part III B of the majority opinion.

### I

In Part III C of its opinion, the majority holds that the children's claims of negligent

---

2. *See Pettingell,* 129 Colo. at 493–95, 271 P.2d at 1043–44 (concluding that the jury should not have been instructed that it could consider whether the defendant *should have known* that his conduct was highly likely to produce injury since the test for willful and wanton conduct required an active mental attitude); *but see*

*Steeves,* 144 Colo. at 10, 354 P.2d at 1014 (stating that conduct is wanton "where one consciously chooses a dangerous course of action with knowledge of facts, which to a reasonable mind creates a strong probability that injury to others will result").

conduct against their father are not barred by the doctrine of qualified parental immunity first announced by this court in *Trevarton v. Trevarton,* 151 Colo. 418, 378 P.2d 640 (1963), and subsequently developed in *Horton v. Reaves,* 186 Colo. 149, 526 P.2d 304 (1974), and *Schlessinger v. Schlessinger,* 796 P.2d 1385 (Colo.1990). In his dissent, Chief Justice Rovira argues that a careful reading of these cases requires the conclusion that the children should be prohibited from seeking damages from their father and his corporation under the circumstances here presented. I agree with the result reached by the majority opinion. However, I believe that, as illustrated by our inability to agree on the application of the doctrine to the circumstances of this case, the common-law exception created in *Trevarton* should be abrogated in favor of a reasonable parenting duty of care standard ·with respect to claims of children for compensation for injuries resulting from the negligent conduct of their parents. Reliance on familiar tort concepts of duty and causation would preserve the public policy principles that are appropriate for judicial recognition and reduce the uncertainty generated by our present formulations of the parental immunity doctrine.

As many courts and commentators have observed, the parental immunity doctrine was enunciated in the late nineteenth century decision of *Hewellette v. George,* 68 Miss. 703, 9 So. 885 (1891). At common law, children were entitled to sue or be sued in tort, contract, property, or equity, unlike their married mothers. W. Page Keeton et al., *Prosser & Keaton on the Law of Torts* § 122 at 904 (5th ed. 1984). In *Hewellette,* the court held that a child was barred from suing her mother's estate for injuries resulting from the mother's conduct in placing the daughter in a mental institution. Citing neither the common law nor precedent, the court stated the following basis for its conclusion:

> The peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society

forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent.

*Hewellette,* 9 So. at 887.

In *McKelvey v. McKelvey,* 111 Tenn. 388, 77 S.W. 664 (1903), and *Roller v. Roller,* 37 Wash. 242, 79 P. 788 (1905), Tennessee and Washington adopted the *Hewellette* rule. Although the parental conduct allegedly involved in these three early cases consisted of intentional acts, other courts cited *Hewellette* and enumerated various allegedly supportive public policy considerations in recognizing the doctrine that children had no legal right to recover damages for injuries caused by the negligent conduct of their parents. *See, e.g.,* Martin J. Rooney and Colleen M. Nouney, *Parental Tort Immunity: Spare the Liability, Spoil the Parent,* 25 New Eng. L.Rev. 1161, 1163 (1991) ("justifications advanced for parental tort immunity were many and varied and included: a) the state's interest in maintaining and preserving family harmony, b) the fear of fraudulent collusive claims, c) the protection of family finances, d) the protection of parental discretion and authority, and e) the analogy to spousal immunity") (citations omitted).

As the majority points out, we have adopted a qualified parental immunity doctrine that recognizes two exceptions to the rule that children may not claim damages for injuries resulting from their parents' negligent conduct. Op. at 932–933. In *Trevarton,* we refused to adopt a rule of absolute parental immunity and, without defining the scope of the doctrine there recognized, held that no immunity exists "where the injuries are inflicted by the parent in the performance of duties relating to business as distinguished from parental duties." *Id.,* 151 Colo. at 423, 378 P.2d at 643. In so doing, we noted with approval the opinion in *Borst v. Borst,* 41 Wash.2d 642, 251 P.2d 149 (1952), wherein the court listed several reasons commonly advanced in support of the rule of absolute immunity and concluded that none of them provided a logical or fair basis for such an absolute rule.[1]

---

1. *Trevarton* contains the following pertinent discussion:

> To justify any rule of immunity courts have been wont to grasp desperately for reasons, but

In *Horton v. Reaves,* we held, *inter alia,* that the evidence failed to establish a willful and wanton misconduct claim asserted by an infant against her mother. *Id.,* 186 Colo. at 156, 526 P.2d at 308. *But see* dissenting opinion of Pringle, J., *id.* at 156–57, 526 P.2d at 308. Although we stated that "under the doctrine of parental immunity, liability of a parent can be predicated only upon willful and wanton misconduct," *Horton,* 186 Colo. at 156, 526 P.2d at 308, our decision in *Schlessinger* reaffirmed the "business exception" to the parental immunity doctrine announced in *Trevarton.*

In *Schlessinger v. Schlessinger,* we held that the Colorado Auto Accident Reparations Act, §§ 10–4–701 through –723, 4A C.R.S. (1987 & 1989 Supp.), did not abrogate the qualified parental immunity doctrine with respect to claims asserted by children against their parents for injuries resulting from negligent operation of motor vehicles. In so doing, we summarized the policy justifications for the doctrine as "maintenance of family harmony and tranquility ... preservation of legitimate parental authority and control ... prevention of fraudulent or collusive suits between family members ... and the safeguarding of family assets lest they be depleted in favor of one child at the expense of other children." *Schlessinger,* 796 P.2d at 1387, 1389.

In adopting a business exception to the rule of absolute parental immunity from tort claims of their children in *Trevarton,* we acknowledged that traditional negligence standards of duty and causation are in some circumstances adequate to safeguard policies now deemed sufficient to support a rule of law that denies children the right to compensation for damages caused by their parents' negligent conduct. Unfortunately, the business exception test assumes the availability of some bright-line standard to distinguish between conduct that is characterized as parental and conduct that is characterized as non-parental. Furthermore, such standard defies predictability because it is too rigid to encompass the complex activities of working parents. A doctrine of reasonable parental care, while certainly not eliminating all controversy, would permit jurors and jurists to concentrate on familiar tort principles of duty and causation rather than struggle with what conduct is more "parental" than "business" in nature. *See Gibson v. Gibson,* 3 Cal.3d 914, 92 Cal.Rptr. 288, 479 P.2d 648 (1971); Note, *The "Reasonable Parent" Standard: An Alternative to Parent–Child Tort Immunity,* 47 U.Colo.L.Rev. 795 (1976); Gail D. Hollister, *Parent–Child Immunity: A Doctrine in Search of Justification,* 50 Fordham L.Rev. 489, 526 (1982).

Several courts have adopted the view that a rule of law granting parents immunity from claims for damages asserted by their children for injuries caused by the parents' own negligent conduct is no longer justifiable. *See, e.g., Gibson,* 92 Cal.Rptr. at 288, 479 P.2d at 648 (abrogating parental immunity doctrine in favor of reasonable parent standard); *Elam v. Elam,* 275 S.C. 132, 268 S.E.2d 109 (1980) (abolishing parental immunity doctrine); *Falco v. Pados,* 444 Pa. 372, 282 A.2d 351 (1971) (abandoning parental immunity doctrine). Significantly, the Supreme Court of Mississippi recently abrogat-

---

many, if not all, fail to withstand attack when subjected to the light of logic and reason.

Reasons advanced for the rule are dealt with in a painstaking and exhaustive opinion, authored by Justice Hamley of the Supreme Court of Washington, in the case of *Borst v. Borst,* 41 Wash. (2d) 642, 251 P. (2d) 149 (1952). He there enumerates the following reasons, advanced by various courts to support the rule:

(1) Public interest in maintaining family harmony and tranquility.

(2) Maintenance of parental authority and discipline.

(3) Prevention of fraud and collusion.

(4) Preservation of equal distribution of the family exchequer.

(5) Avoidance of useless litigation in that the parent may, in the event of the death of the child, inherit any money which the child may have recovered from the parent.

(6) Prevention of assertion of stale claims of minors on their reaching majority.

He then deals extensively with each reason and convincingly demonstrates that:

"... none of the arguments [reasons] which have been discussed above provides a logical and just basis for an absolute rule of immunity applicable to all actions arising in tort for the recovery of persons injury damages."

*Trevarton,* 151 Colo. at 421, 378 P.2d at 641–420.

ed the parental immunity doctrine established over one hundred years ago in *Hewellette v. George*, 68 Miss. 703, 9 So. 885 (1891). *Glaskox v. Glaskox*, 614 So.2d 906 (Miss. 1992). The *Glaskox* court observed that legal scholars "have almost universally condemned the doctrine, and the trend judicially is toward a steady erosion of the rule...." *Id.* at 909. The court concluded that traditional negligence concepts of duty and causation would appropriately safeguard those policies assertedly protected by the parental immunity doctrine and its exceptions.

Scholars and courts criticizing the parental immunity doctrine contend that the grounds articulated as public policy justifications for the rule are unpersuasive. One frequently cited justification is the desire to preserve family harmony and tranquility. The *Glaskox* court addressed that issue as follows:

> [T]he immunity rule has not been applied to property rights, contract rights, an emancipated child, wrongful death actions, suits between brothers and sisters, a stepfather, an adoptive parent, or a grandparent, to cases where the child is injured in the course of a business rather than a personal activity, and in suits involving willful, wanton, intentional or criminal conduct. If harmony and unity in the family is the public policy protecting the rule, it would seem to be present in these areas.... From these observations, it is easy to conclude that the justification for the rule based on harmony, cooperation and family affection and its preservation is an excuse rather than a solid foundation for the rule.

*Glaskox*, 614 So.2d at 912 (quoting *Stallman v. Youngquist*, 129 Ill.App.3d 859, 85 Ill.Dec. 32, 35, 473 N.E.2d 400, 403 (1984)). As one commentator has suggested, familial disharmony would be occasioned primarily by the facts of the parents' conduct and the resulting injuries to a member of the family rather than the absence of a parental immunity doctrine. Gail D. Hollister, *Parent–Child Immunity: A Doctrine in Search of Justification*, 50 Fordham L.Rev. 489, 502 (1982). If recognition of personal responsibility for conduct is an integral ingredient in that core set of values that contribute to family harmo-

ny, a doctrine establishing a parent's right to avoid personal responsibility for injurious and unreasonable conduct at the expense of an injured child seems ill-designed to achieve the purported goal. *See Nocktonick v. Nocktonick*, 227 Kan. 758, 611 P.2d 135, 141 (1980) ("the argument that parental immunity is necessary to preserve the tranquility and harmony of domestic life misconceives the facts of domestic life. The primary disruption to harmonious family relationships is not the lawsuit brought for damages after the injury but the injury itself, resulting from the misconduct of a parent....").

Concerns over depletion of family assets or undue favoritism of an injured child are less persuasive. Whether insurance proceeds are or are not available, a family's resources will probably be devoted to caring for injuries, serious or slight, sustained by a particular child. The degree of financial strain on the family would remain constant whether the injuries are caused by the negligent conduct of family members or non-family members. *See Nocktonick*, 611 P.2d at 141; *Smith v. Kauffman*, 212 Va. 181, 183 S.E.2d 190, 194 (1971). A decision by a parent not to allocate a sufficient, albeit disproportionate, share of family assets to the care of a child seriously injured as the result of the parent's negligent conduct might reflect preexistent discord and most certainly would result in disharmony if none existed. *See Sorensen v. Sorensen*, 339 N.E.2d 907, 913–14 (Mass.1975).

Another justification offered in support of the parental immunity doctrine is the desire to prevent fraud and collusion in the filing of intra-family claims, especially where insurance proceeds might be available. This admittedly admirable goal should not shield parents who in fact injure their children by means of unreasonable conduct from traditional principles of tort liability based on standards of duty and causation. *Glaskox*, 614 So.2d at 912. Penalties for perjured testimony, procedural rules authorizing awards of attorney fees and costs for the filing of frivolous suits, vigorous claim investigation and other aspects of the adversary process designed to protect individuals and the public from the cost of spurious litigation, while never completely effective, greatly di-

minish the likelihood of successful attempts at collusive litigation in this as in other areas. If, as has been suggested, the presence of potential insurance proceeds would stimulate the great majority of collusive intra-family litigation, *see* Note, *The "Reasonable Parent" Standard: An Alternative to Parent–Child Immunity,* 47 U.Colo.L.Rev. 795, 798–99 (1976), special rules of heightened scrutiny for such suits might be appropriate. The possibility of collusive litigation can no longer justify a doctrine that in effect informs families that an injured child member thereof cannot obtain compensation in his or her own right for injuries which if caused by a nonparent would be so compensable, that such injured child must rely upon the temperament of the negligent parent to obtain any redress for such injuries, and that parents have no legally enforceable duty to act reasonably in caring for and controlling their children. Such messages ill serve the promotion of family harmony.

The argument that reliance on traditional tort concepts of duty and causation in the area of parental negligence might permit negligent parents to inherit the proceeds of any successful lawsuit in the event the injured child dies is particularly unpersuasive. As one commentator has aptly noted:

[Such view] is inconsistent with general tort law which does not refer to the possible heirs to a recovery as a relevant factor in permitting suit. More specifically, if the parent is uninsured, denying recovery allows the parent to retain those very funds which the courts are concerned he [or she] may subsequently inherit. On the other hand, if insurance is present, denying the child's recovery because of such a remote possibility would penalize the child who was the intended beneficiary of the parent's prudence in providing the insurance policy. Denial of the child's action would also frustrate the purpose underlying the coverage which was to relieve the insured parents of the financial burden of caring for their injured child.

*Id.* at 802.

At the heart of the parental immunity doctrine is the recognition that parents must be accorded considerable freedom in their ability to exercise care of and authority and control over their children. As the court observed in *Foldi v. Jeffries,* 93 N.J. 533, 461 A.2d 1145 (1983):

There are certain areas of activities within the family sphere involving parents, discipline, care, and control that should and must remain free from judicial intrusion. Parents should be free to determine how much the physical, moral, emotional, and intellectual growth of their children can best be promoted. That is both their duty and their privilege. Indeed, every parent has a unique philosophy of the rearing of children. That philosophy is an outgrowth of the parent's own economic, educational, cultural, ethical, and religious background, all of which affect the parent's judgment on how his or her children should be prepared for the responsibilities of adulthood. Such philosophical considerations come directly to the fore in matters of parental supervision. . . .

. . . .

. . . The parent is clearly in the best position to know the limitations and capabilities of his or her own children. These intangibles cannot be adequately conveyed within the normal atmosphere of a courtroom. Nor do we believe that a court or a jury can evaluate these highly subjective factors without somehow supplanting the parent's own individual philosophy.

*Id.* 461 A.2d at 1152.

We recognized the importance of this principle in *Trevarton,* 151 Colo. at 421, 378 P.2d at 642, and *Schlessinger,* 796 P.2d at 1387–89. Counter-balanced against this principle is the recognition that an injured person, even a child, is entitled to just compensation from the person negligently causing such injuries. *See* Note, *In Whose Best Interest? Exploring the Continuing Viability of the Parental Immunity Doctrine,* 53 Ohio St.L.J. 1111, 1117 (1992). In *Schlessinger,* we recognized the tension inevitably resulting from the juxtaposition of these principles and adhered to the approach that parents will remain immune from liability for negligent infliction of injuries on their children if the negligent conduct occurs in the course of exercising parental responsibilities. The majority today

in essence holds that if a parent's conduct occurs in the course of exercising both parental and business duties, the immunity vanishes. The dissent of the Chief Justice protests that this exception destroys the rule itself. I believe the better course would be to abandon the doctrine of parental immunity for negligent treatment of children—a rule conceived in abrogation of the common law and now qualified in such manner as to render its application uncertain and the results of its application too often unjust. Although we recently reaffirmed our qualified parental immunity doctrine in *Schlessinger,* I believe the doctrine should be abrogated. The role of parental care of and control and authority over children can be defined adequately and effectively by traditional tort concepts of duty and causation.

## II

For the foregoing reasons, I concur specially in Part III C of the majority opinion. I join that part of Justice LOHR's opinion dissenting from Part III B of the majority opinion.